DA 14-0487

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2017 MT 54

STATE OF MONTANA,

       Plaintiff and Appellee,

    v.

DENIS AGUADO,

       Defendant and Appellant.

APPEAL FROM:     District Court of the Twenty-Second Judicial District,
In and For the County of Stillwater, Cause No. DC 12-23
Honorable Randal I. Spaulding, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Colin M. Stephens, Smith & Stephens, P.C, Missoula, Montana

       For Appellee:

           Timothy C. Fox, Montana Attorney General, Tammy A. Hinderman,
Assistant Attorney General, Helena, Montana

           Nancy L. Rohde, Stillwater County Attorney, Columbus, Montana

Submitted on Briefs:  January 18, 2017

Decided:  March 7, 2017

Filed:

_____
Clerk

FILED

03/07/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0487

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Denis Aguado (Aguado), appeals his convictions of Sexual Abuse of Children and Sexual Assault upon A.M., after jury trials in the Twenty-Second Judicial District Court, Stillwater County, arguing the court erred by not substituting his defense counsel, incorrectly applying the "Rape Shield" statute, improperly removing Juror No. 5, and giving an incorrect unanimity instruction. We affirm and address these issues:

*1. Did the District Court err by not substituting Aguado's counsel?*

*2. Did the District Court violate Aguado's confrontation rights by excluding evidence pursuant to § 45-5-511(2), MCA?*

*3. Did the District Court err by dismissing Juror No. 5 in the second trial?*

*4. Did the District Court err by not giving a more specific unanimity instruction?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Aguado and his then-wife, Patricia Aguado (Patricia), lived in Columbus, Montana. A.M., Patricia's granddaughter, moved into Aguado and Patricia's home when she was young due to her mother's inability to care for her. As such, A.M. was raised by Patricia and Aguado and considered Aguado to be a grandfather figure.

¶3 In June or early July, 2012, during a family vacation to Montana from Kentucky, Patricia's children, Ashley Sexton (Ashley) and Ricky Mills (Ricky) (A.M.'s aunt and uncle), observed interactions between Aguado and A.M. that raised suspicions regarding the relationship between them. As was usual each summer, A.M. returned with Ashley to Kentucky to spend time with her family there, including A.M.'s brother, T.M., who was being raised by Ashley. During a drive to Wal-Mart, Ashley asked A.M. "if there was

anybody that was trying to touch her or make her do things she didn't want to do." A.M. told Ashley that Aguado "had tried to force himself on her thrusting his hand down her pants and threatened to kill Patricia and A.M. if she told anyone." A.M. told Ashley about a "sex contract" she had signed with Aguado as a means to get Aguado to stop his sexual actions. She said the document was hidden under her mattress at Aguado and Patricia's home in Columbus. Ashley informed Ricky about A.M.'s disclosure and the two of them proposed that A.M. record a phone call between her and Aguado after A.M. informed them that Aguado would talk about sex with her on the phone.

¶4 Ricky set up recording equipment on the phone and A.M. made a call with Ashley present for support. The conversation became sexually explicit, with Aguado asking A.M. if they were "still on" for doing the "full fuck" and the "Big Lick" when she returned to Montana, and later asking A.M. if she was "ready for a full fuck?", saying that she was "gonna love it, baby." Aguado told A.M. that she "need[ed] to [have sexual intercourse] as much as you can the first two weeks" to alleviate any pain and said that he would "take care o' ya" because he knew "how to do it where it ain't gonna bother you that much." A.M. was thirteen years old at the time of the phone call.

¶5 After the phone call, Ashley, Ricky, and another family member drove to Montana to inform Patricia and attempt to find the "sex contract" A.M. had described. Upon arriving, Ricky found the document where A.M. said it would be. The next day, Ricky advised Patricia of A.M.'s allegations and played the recording of Aguado and A.M.'s telephone conversation. Later that day, Ricky, Ashley, and Patricia made an initial report

3

to the Stillwater County Sheriff's Department and, the following day, fully reported the incident and turned over the recording and "sex contract" to authorities. Aguado was arrested that day and later charged with Sexual Abuse of Children and Sexual Assault.

¶6 At the two trials, A.M. testified that Aguado had showed her pornographic videos when she was six years old and began touching her inappropriately about the same time. A.M. testified that Aguado touched her private parts "[p]retty much almost every day," which often occurred in the car or A.M.'s bedroom. A.M. also testified to multiple instances of sexual assault, some involving Aguado's use of force and A.M.'s active resistance. A.M. testified the "sex contract" stated she "had to go all the way and [do a] big lick" with Aguado on a given day and that Aguado had her sign it "[b]ecause he would always ask for something and I would say 'I promise,' when I really didn't want to do it. And I would always lie when I'd say 'I promise', to him, so he made me write it down."

¶7 The jury found Aguado guilty of Sexual Abuse of Children, but hung on the charge of Sexual Assault. The State pursued a second trial on the Sexual Assault charge, after which the jury found Aguado guilty. Aguado appeals. Additional facts are discussed as necessary.

## STANDARDS OF REVIEW

¶8 A request to substitute counsel is within the sound discretion of the district court, reviewed for abuse of discretion. *State v. Cheetham*, 2016 MT 151, ¶ 13, 384 Mont. 1, 373 P.3d 45 (citing *State v. Edwards*, 2011 MT 210, ¶ 14, 361 Mont. 478, 260 P.3d 396).

¶9 We review a district court's application of a statute for correctness. *State v. Colburn*, 2016 MT 41, ¶ 6, 382 Mont. 223, 366 P.3d 258 (citing *Beehler v. E. Radiological Assocs., P.C.*, 2012 MT 260, ¶ 17, 367 Mont. 21, 289 P.3d 131).

¶10 The trial court has discretion to remove a juror and seat an alternate juror whenever the facts show the juror's ability to perform his duties is impaired. *State v. Grindheim*, 2004 MT 311, ¶ 18, 323 Mont. 519, 101 P.3d 267 (citing *State v. Pease*, 222 Mont. 455, 470, 724 P.2d 153, 162-63 (1986)). The reviewing court will not disturb the ruling unless the defendant shows bias or prejudice. *Grindheim*, ¶ 18 (citing *Pease*, 222 Mont. at 470-71, 724 P.2d at 163).

¶11 We review jury instructions to determine whether, as a whole, they fully and fairly instruct the jury on the applicable law. *State v. Dunfee*, 2005 MT 147, ¶ 20, 327 Mont. 335, 114 P.3d 217 (citing *State v. Courville*, 2002 MT 330, ¶ 15, 313 Mont. 218, 61 P.3d 749). A district court has broad discretion when it instructs the jury. *State v. Hall*, 2003 MT 253, ¶ 24, 317 Mont. 356, 77 P.3d 239 (citing *Courville*, ¶ 15). To constitute reversible error, jury instructions must prejudicially affect the defendant's substantial rights. *Courville*, ¶ 15 (citing *State v. Goulet*, 283 Mont. 38, 41, 938 P.2d 1330, 1332 (1997)).

## DISCUSSION

¶12 *1. Did the District Court err by not substituting Aguado's counsel?*

¶13 Aguado argues the District Court improperly denied his two requests for substitution of counsel. He argues the multiple complaints he made about his public

defender, Gregory Paskell (Paskell), and the evidence adduced at two hearings demonstrate that tension and conflicts of interest existed between Aguado and Paskell such that Paskell should have been replaced. The State counters that Aguado did not demonstrate to the District Court that "Paskell was operating under an actual conflict," nor that counsel's performance was affected by the claimed conflict.

¶14 After the first trial, Aguado filed a motion to substitute counsel, asserting that Paskell had communicated with the prosecution without authorization, was excessively argumentative, refused to file certain motions, refused to provide adequate investigative and professional services, and aided in violating Aguado's rights due to excessive bail. Aguado stated he had filed a complaint with the Office of Disciplinary Counsel (ODC) against Paskell and, as such, must be given a private attorney because all public defenders were likewise conflicted. The District Court scheduled a hearing to inquire into Aguado's claims and ordered Paskell to respond to the allegations, issuing a *Gillham*[1] order that stated "[t]o the extent that defense counsel . . . necessarily reveals confidential information," he would not be subject to disciplinary proceedings.

¶15 During the hearing, the District Court addressed Aguado's allegations individually, allowing Aguado to fully state his concerns on each one. However, Aguado was unable to provide specifics and admitted he actually had not filed an ODC complaint against Paskell. Aguado then claimed he had not received all of the discovery documents and that Paskell would not provide him additional copies of documents.

---

[1] *In re Gillham*, 216 Mont. 279, 704 P.2d 1019 (1985).

¶16  Pursuant to the District Court's request, Paskell responded and stated that he had spent over 400 hours in this case and was not Aguado's first attorney. Aguado had initially hired a private attorney who withdrew before Paskell was appointed as his public defender. Paskell stated that the prior attorney had done little preparation and that Paskell needed the first continuance he had requested to be adequately prepared for trial. Paskell noted the motion to suppress he had filed as a result of the continuance was successful in suppressing much of the evidence against Aguado.[2] Paskell stated that Aguado has "alleged various kinds of conspiracies and issues concerning the production of the phone conversation, the sex contract and other matters" but that those allegations had been fully investigated. Regarding Aguado's discovery concerns, Paskell stated that discovery documents are provided "as a matter of rule and policy" by the Office of Public Defender (OPD) and "everything that comes into the office goes right to the client." Regarding the copies Aguado had alleged Paskell would not make for him, Paskell stated that the documents in question regarded Aguado's insurance issues, and that OPD did not have resources to make copies for other matters. Paskell explained that he had filed some motions on Aguado's behalf, but that he believed others to be potentially irrelevant, and that certain witnesses Aguado wanted called would provide only duplicative testimony. Finally, Paskell noted that Aguado's concern that he was delaying the trial was incorrect because "[e]verything that we did for Mr. Aguado proved somewhat if not successful."

---

[2] Paskell's motion resulted in an order suppressing the evidence from Aguado's laptop and a box found in an outbuilding, called a "rape kit" by the parties, that contained items associated with sexual activity.

7

Paskell stated that he could represent Aguado effectively, and Aguado stated that he could continue with Paskell "[i]f need be."

¶17 The District Court denied Aguado's request for substitution, concluding that he had failed to raise "seemingly substantial" complaints and had "not demonstrated that there has been a total breakdown in communication between he and attorney Paskell."

¶18 Shortly before the second trial, Paskell sent a letter to the District Court "to advise the court on certain matters of importance" and that Paskell had permission from Aguado to speak with the District Court about these matters. Paskell stated that Aguado wanted new counsel and that Aguado planned, on the first day of trial, to fire Paskell. Paskell stated Aguado wanted a continuance to further analyze the evidence, and that Aguado claimed Paskell had conspired with the State to conceal documents from Aguado.

¶19 The District Court conducted a hearing and heard Aguado's complaints against Paskell. The hearing considered both the request for new counsel and Aguado's motion to continue the trial. Aguado stated that Paskell had provided him a copy of his entire case file, which he claimed had 5,000 documents. In the file, Aguado had found a copy of Ricky's phone bill, which he claimed was never provided to him despite repeated requests. Noting research contained in the file regarding federal communications statutes, Aguado claimed the phone call between he and A.M. was illegally recorded and should have been suppressed. Aguado claimed that "Mr. Paskell deliberately withheld those documents from me. For what reason, I have no idea. It's been prejudice against me and the same with the State prosecutors."

8

¶20    In response, Paskell stated that he had made a complete copy of his file to give to Aguado, but it contained 300 or 400 pages of discovery, not 5,000. He explained that he and Aguado disagreed on whether federal statute precluded introduction of the evidence. He also reiterated that the OPD has procedures to provide copies to clients and was "very confident" this had been done for Aguado.

¶21    The District Court explained to Aguado that if it were to deny his request for substitution of counsel, he would have either the choice of continuing with Paskell or representing himself, and explained the risks of self-representation. The court asked Aguado if he could continue to work with Paskell, and Aguado responded that he had lost trust in Paskell. Paskell stated he was "willing to continue to represent [Aguado]."

¶22    The District Court issued an order concluding that Aguado "has once again failed to raise a seemingly substantial complaint in regards to his attorney" and denied the motion. The District Court stated Paskell has "been a consummate professional and has zealously and effectively represented the Defendant since day one."

¶23    Criminal defendants have a fundamental right to effective assistance of counsel. U.S. Const. amend. VI; Mont. Const. art. II, § 24; *State v. Happel*, 2010 MT 200, ¶ 14, 357 Mont. 390, 240 P.3d 1016. "However, 'the right to assistance of counsel does not grant defendants the right to counsel of their choice.'" *State v. Dethman*, 2010 MT 268, ¶ 15, 358 Mont. 384, 245 P.3d 30 (quoting *State v. Craig*, 274 Mont. 140, 149, 906 P.2d 683, 688 (1995)); *accord Cheetham*, ¶ 18. "When a defendant complains about ineffective assistance of appointed counsel and requests new counsel, a district court

must make 'adequate initial inquiry' as to whether defendant's allegations are 'seemingly substantial.'" *Dethman*, ¶ 16 (quoting *Happel*, ¶ 14; *State v. Gallagher*, 1998 MT 70, ¶ 15, 288 Mont. 180, 955 P.2d 1371). "A district court conducts 'adequate initial inquiry' when it considers the defendant's factual complaints together with counsel's specific explanations and makes some sort of critical analysis of the complaint." *Dethman*, ¶ 16 (quoting *Happel*, ¶ 14). A district court conducts an inadequate inquiry where it "fails to conduct 'even a cursory inquiry'" into the defendant's allegations. *Cheetham*, ¶ 20 (quoting *State v. Schowengerdt*, 2015 MT 133, ¶ 17, 379 Mont. 182, 348 P.3d 664).

¶24 We have explained that, to obtain substitution of counsel, the defendant bears the burden of proving: (1) "complete collapse of the attorney-client relationship"; (2) "total lack of communication"; or (3) "ineffective assistance of counsel [IAC]." *Cheetham*, ¶ 19 (citing *Edwards*, ¶ 32; *State v. Kaske*, 2002 MT 106, ¶ 30, 309 Mont. 445, 47 P.3d 824). A complaint is "seemingly substantial" if it provides a legitimate concern about any of these grounds.

¶25 However, an inquiry into a complaint of ineffective assistance for purposes of substitution of counsel should not become *Strickland* litigation to resolve the merits of such claims. As we stated in *Cheetham*:

> A claim of ineffective assistance based on differences between the defendant and his counsel about trial strategy and production of evidence is available in, and better suited for, a postconviction proceeding where counsel may divulge more freely—with appropriate safeguards (*In re Gillham*, 216 Mont. 279, 282, 704 P.2d 1019, 1021 (1985))—his or her communications with the defendant and strategic decisions.

10

*Cheetham*, ¶ 29; *see also Cheetham*, ¶ 39 (McKinnon, J., concurring) ("While precedent regarding ineffectiveness claims informs our understanding of the right to substitution, a judge should not be required to conduct a collateral proceeding during the pendency of a trial, which is more appropriately handled through a postconviction proceeding."). While the court may need to inquire sufficiently of the defendant and counsel to determine whether a complete collapse of communication or of the relationship has occurred, this should not necessitate the issuance of a *Gillham* order. *Cheetham*, ¶ 29 ("By its terms, the procedure we directed in *Gillham* applies to petitions for postconviction relief when a response from defense counsel is necessary."). The appropriate time for an evaluation of the merits of an ineffectiveness claim is either on direct appeal, if the IAC claims are record-based, or in a postconviction proceeding if the grounds are not record-based. *State v. Howard*, 2011 MT 246, ¶ 21, 362 Mont. 196, 265 P.3d 606 ("When claims of ineffective assistance are capable of resolution by examining the record alone, they are appropriate for consideration on direct appeal."); *State v. Herrman*, 2003 MT 149, ¶ 24, 316 Mont. 198, 70 P.3d 738 ("[I]f the Court cannot make that determination from the record before it, then it must decline to proceed further and allow the defendant to raise his ineffective assistance of counsel claim in a petition for postconviction relief."). "In reviewing a district court's inquiry [regarding a substitution of counsel request], we do not examine whether counsel was ineffective, but instead, whether the district court's inquiry into the claim was adequate." *Cheetham*, ¶ 20 (citing *State v. MacGregor*, 2013 MT 297, ¶ 25, 372 Mont. 142, 311 P.3d 428). "It is within the sound discretion of the

11

district court to rule on requests for appointment of new counsel." *State v. Hendershot*, 2007 MT 49, ¶ 23, 336 Mont. 164, 153 P.3d 619; *accord Gallagher*, ¶ 10; *Craig*, 274 Mont. at 149, 906 P.2d at 688.

¶26 Here, the District Court conducted considerable inquiries into Aguado's complaints, working methodically through all of them. The complaints from Aguado and the responses from Paskell both indicate there was conflict and disagreement regarding how to conduct the case. However, there is ample evidence that Paskell and Aguado were able to communicate, no evidence that Paskell had a true conflict that would prevent him from representing Aguado, and no legitimate concerns that Paskell was providing ineffective assistance. Indeed, Paskell effectively obtained an order suppressing evidence against Aguado, and the first trial ended in a hung jury on one of the counts. The District Court did not abuse its discretion in determining that Aguado's complaints were not seemingly substantial and in denying his substitution motion.

¶27 *2. Did the District Court violate Aguado's confrontation rights by excluding evidence pursuant to § 45-5-511(2), MCA?*

¶28 The State filed a motion in limine to exclude any evidence regarding A.M.'s sexuality, including any specific acts with others. Aguado opposed the motion, arguing that A.M.'s sexual orientation provided context to the phone call between them. Particularly, as stated in his offer of proof, Aguado sought to introduce evidence that A.M. was being bullied at school for her bisexual orientation and that she planned to go on an overnight camping trip to have sex with a boy to alleviate bullying on the issue. Aguado alleged that, when A.M. asked to go on the camping trip, he and Patricia had

denied permission, after which A.M. had allegedly told Aguado "maybe I should fuck you." Aguado argued that A.M. made statements to Aguado that led him to believe that she was planning to have sex with her half-brother and another unnamed male while in Kentucky. For what it was worth, Aguado wanted to argue to the jury that, in light of this evidence, the phone call between he and A.M. must be understood as him encouraging A.M. to return to Montana so they "could further discuss the bullying, her response to it and her possible involvement with others sexually in order to prevent inappropriate sexual choices."

¶29 The District Court granted the State's motion, reasoning that Aguado's offer of proof did not "rebut, contextualize, or explain" the statements made during the phone call and that "the evidence appears primarily to be directed at sullying the victim's character by painting her an overly sexualized, lesbian or bisexual teenage girl and placing her on trial, the very thing prohibited by § 45-5-511." The District Court held:

> The defense may not offer nor suffer to be offered any evidence concerning the victim's prior sexual conduct, except with the defendant, or prior instances of sexual abuse of the victim, if any. Such prohibition shall include any reference to the victim's sexual orientation, sexualized or flirtatious behavior, and/or purported desire or plan to have sex with anyone, aside from the Defendant.

¶30 Despite this ruling, the District Court permitted significant context evidence to be introduced by Aguado. In the first trial, Aguado elicited testimony from A.M. that she was being bullied for "weird choices" she had made, and that Aguado had denied her request to go to the park because of his assertion that she was going to "have sex with boys there." Aguado testified about A.M.'s bullying and that she had a solution which,

Aguado believed, was for A.M. to have sex with a male. He also testified that he believed A.M. was going to have sex with someone in Kentucky and that his intent during the recorded phone call "was to get her to come back here to Montana. And to—I just played along with her, pretty much" in order to get her away from the drinking, drugs, and "heavy sexual activities" down in Kentucky. Aguado testified similarly in the second trial:

> What you heard on the tape, to be blunt, is what she wanted. Okay? Everything you heard on that tape, she didn't back off nothing. You can tell by her tone. You could tell she was asking me. What you heard on that tape was what she wanted. It's not what I wanted. It's what she wanted. I was playing into her, is what I was doing.

On appeal, Aguado argues the District Court should have allowed him to go further into the "exact nature" of the bullying, i.e., that A.M. was bisexual in orientation.

¶31 Under the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution, a defendant has the "right to confront his accusers." *Colburn*, ¶ 24 (citing *State v. MacKinnon*, 1998 MT 78, ¶ 33, 288 Mont. 329, 957 P.2d 23). Similarly, a defendant has a right to "present evidence in his defense." *Colburn*, ¶ 24 (citing *State v. Johnson*, 1998 MT 107, ¶ 22, 288 Mont. 513, 958 P.2d 1182).

¶32 Montana's Rape Shield Law provides:

> Evidence concerning the sexual conduct of the victim is inadmissible in prosecutions under this part except evidence of the victim's past sexual conduct with the offender or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease that is at issue in the prosecution.

14

Section 45-5-511(2), MCA.

¶33 "Neither the Rape Shield Law nor the defendant's right to confront and present evidence are absolute." *Colburn*, ¶ 25 (citing *MacKinnon*, ¶ 33 ("[L]imiting the scope of cross-examination does not necessarily violate a defendant's right to confront an adverse witness."); *Johnson*, ¶¶ 22-23 ("We have held that the Sixth Amendment right of confrontation is not absolute and that the Rape Shield Law serves a compelling state interest in preventing rape trials from becoming trials on the prior sexual conduct of the victims.")). As we held in *Johnson*, "state and federal rules excluding evidence from criminal trials do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *Johnson*, ¶ 22 (citing *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 1264 (1998) ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. . . . [W]e have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.")). Thus, to resolve the tension between the defendant's right to present a defense and the victim's rights under the statute, the district court must "strike a balance in each case." *Colburn*, ¶ 25 (citing *State v. Lindberg*, 2008 MT 389, ¶ 53, 347 Mont. 76, 196 P.3d 1252). The balancing must "require that the defendant's proffered evidence is not merely speculative or unsupported." *Colburn*, ¶ 25 (citing *Johnson*, ¶ 24; *Lindberg*, ¶ 56). Further, in accordance with the M. R. Evid., the district court should "consider whether the evidence is relevant and probative; whether the

15

evidence is merely cumulative of other admissible evidence; and whether the probative value of the evidence is outweighed by its prejudicial effect." *Colburn*, ¶ 25 (internal citations omitted). All balancing is done with the intent to "ensure a fair trial for the defendant while upholding the compelling interest of the Rape Shield Law in preserving the integrity of the trial and keeping it from becoming a trial of the victim." *Colburn*, ¶ 25 (citing *State v. Anderson*, 211 Mont. 272, 283, 686 P.2d 193, 199 (1984)).

¶34     Here, the District Court reviewed Aguado's context theory and determined that the evidence was not being offered to "rebut, contextualize, or explain" the statements in the phone call, but served to prejudice A.M. First, the theory was speculative. If A.M. was indeed bisexual, having sex with a male may have done nothing to alleviate bullying over a bisexual orientation. Indeed, it may have provided reason for further negative attention, especially if committed with her grandfather. And, Aguado told A.M. in the phone call that no one would know they had sexual intercourse, which would also defeat Aguado's theory. Second, Aguado's context theory conflicts with the actual conversation during the phone call. Aguado did not play along with a plan proposed by A.M. Rather, Aguado raises the subject of sex by asking A.M. if "we're still on" and if she's ready for "full" sexual activity. The District Court was correct—Aguado's purpose was to prejudice A.M. in the eyes of the jury. Finally, the District Court allowed much of what Aguado wished to introduce, only excluding A.M.'s sexuality. Accordingly, the District Court did not abuse its discretion and there was no error.

16

¶35     *3. Did the District Court err by dismissing Juror No. 5 in the second trial?*

¶36     During jury selection in the second trial, the District Court asked each prospective juror whether "anyone had a close family member or they themselves been sexually abused or accused of such." A number of potential jurors indicated they met the criteria and each was individually questioned in chambers. However, Juror No. 5 did not respond in the affirmative and was eventually seated on the jury.

¶37     After the prosecution had given its opening statement, but before presenting evidence, a Columbus police officer advised the prosecution that Juror No. 5's son had previously been convicted of a sexual offense. The State informed Judge Spaulding, who questioned the juror. Juror No. 5 acknowledged that his son had been convicted of statutory sexual intercourse without consent. He explained that he did not disclose the conviction during voir dire because he "didn't picture it as a sexual assault. It was boyfriend-girlfriend. He was a year or so older than the girlfriend." He assured the court that he could judge the case impartially.

¶38     The State was concerned that the juror had not disclosed the incident during voir dire in response to the question asking for such disclosure. The State advised the court that it would likely have used a preemptory challenge to strike the juror had it known this information during voir dire, and asked the District Court to excuse him and seat the alternate juror. Aguado argued that Juror No. 5's assurances that he could be fair and unbiased were sufficient. The District Court dismissed Juror No. 5 because he had failed

17

to disclose his son's conviction and seated the alternate to "avoid absolutely any argument that anything improper has occurred here."

¶39 On appeal, Aguado argues that the District Court abused its discretion in seating the alternate juror because the State only learned about the lack of disclosure due to the "knowledge of law enforcement" and none of the information came to light during voir dire. Aguado adds that Juror No. 5 did not "willfully or intentionally withhold material information" and assured the District Court that he could be unbiased.

¶40 Montana Code provides that, "[a]lternate jurors, in the order in which they are called, shall replace jurors who, prior to the time the jury arrives at its verdict, become unable or disqualified to perform their duties." Section 46-16-118(3), MCA. "The trial court has discretion to remove a juror and seat an alternate juror whenever the facts show the juror's ability to perform his duties is impaired." *Grindheim*, ¶ 18 (citing *Pease*, 222 Mont. at 470, 724 P.2d at 162-63).

¶41 In *Pease*, the district court replaced a juror during the trial after learning he was soon to be arrested for a felony he had confessed to. *Pease*, 222 Mont. at 469-70, 724 P.2d at 162. The State moved to disqualify the juror, arguing he may be "overly sympathetic to the defendant or he may vote for a conviction to gain leniency from the State." *Pease*, 222 Mont. at 470, 724 P.2d at 162. We held that the defendant had to demonstrate "bias or prejudice," such as "discharge of a juror for want of any factual support, or for a legally irrelevant reason," in seating the alternate juror. *Pease*, 222 Mont. at 470-71, 724 P.2d at 163. Ultimately, we concluded that there was not an abuse

18

of discretion and that the district court had provided a "legal reason" for the discharge. *Pease*, 222 Mont. at 471, 724 P.2d at 163.

¶42     Here, the District Court's questions revealed that Juror No. 5 may have not been truthful during voir dire, and that the State would likely have used a preemptory challenge had the truth been told. The District Court determined that the lack of candor during voir dire was a sufficient basis to justify seating the alternate juror. Jurors may be removed for cause for a variety of reasons, including "for any other reason that the court determines." Section 46-16-115, MCA. "Although a defendant is entitled to an impartial jury, he has no right to a particular juror." *State v. Bearchild*, 2004 MT 355, ¶ 21, 324 Mont. 435, 103 P.3d 1006 (citing *State v. LaMere*, 2000 MT 45, ¶ 37, 298 Mont. 358, 2 P.3d 204). Aguado passed the alternate for cause and the District Court had a good legal reason and factual support to seat the alternate. Accordingly, the District Court did not abuse its discretion.

¶43     *4. Did the District Court err by not giving a more specific unanimity instruction?*

¶44     Aguado argues that the District Court improperly instructed the jury when it utilized the pattern unanimity instruction from the Montana Pattern Jury Instructions. Aguado alleges the problem with the instruction, given the "sheer volume of allegations put forth by A.M. that could be see[n] to constitute the offense of sexual assault," is that it did not "sufficiently instruct the jury . . . that it must unanimously decide on the exact when and where of the single count that constitutes the offense." The State argues that the allegations here likely satisfy our holding in *State v. Harris*, 2001 MT 231, ¶ 15, 306

19

Mont. 525, 36 P.3d 372, *abrogated in part on other grounds by Robinson v. State*, 2010 MT 108, ¶ 12 n.1, 356 Mont. 282, 232 P.3d 403, that where "persistent illegal acts were so frequently perpetuated and so closely connected as to be properly viewed as a single, continuous, running offense" no unanimity instruction is needed, but that, even so, the instruction given was adequate and "in no way compromised Aguado's guilty verdict."

¶45     In *State v. Weaver*, 1998 MT 167, 290 Mont. 58, 964 P.2d 713, we held that, when a defendant is charged "with a series of unrelated allegations of sexual misconduct taking place over a period of years," the district court, "where appropriate," must issue a unanimity instruction. *Weaver*, ¶¶ 38-39. We later clarified that holding in *Harris*.

¶46     Aguado was charged with one count of Sexual Assault that covered a period of three years in the second trial. On the stand, A.M. testified to both repeated instances of sexual assault and to sexual events occurring frequently and in close connection. Perhaps given out of caution, the District Court's decision to give the pattern unanimity instruction, and not a different unanimity instruction, was not an abuse of discretion. We cannot conclude that the court failed to "fully and fairly instruct the jury on the law applicable to the case." *Dunfee*, ¶ 20.

¶47     Affirmed.

/S/ JIM RICE

We concur:

/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ DIRK M. SANDEFUR

20

Justice Laurie McKinnon, specially concurring.

¶48    I agree with the Court's resolution of all issues in these proceedings, with the exception of the first issue regarding substitution of counsel.  I continue to believe that the Court fails to properly enunciate a standard by which the trial court may assess the merits of such a motion.  *See generally Cheetham*, ¶¶ 38-46 (McKinnon, J., specially concurring).  Here, while the Court states that "we do not examine whether counsel was ineffective," Opinion, ¶ 25, we nonetheless continue to allow for substitution of counsel if the defendant can demonstrate "ineffective assistance of counsel[.]"  Opinion, ¶ 24. Our inconsistency and unwillingness to properly differentiate between an ineffective assistance of counsel claim, appropriately raised in a collateral postconviction proceeding, and a request for substitution of counsel, raised during the pendency of trial, leaves the trial court and litigants without the appropriate guidance they should receive from this Court.  Failure to adequately distinguish the two types of inquiries will continue to require collateral proceedings during the pendency of a trial and issuance of *Gillham* orders, both of which were done here.  In my opinion, it is time to clearly state for the trial courts and litigants what standard to employ when conducting an "adequate initial inquiry." *Dethman*, ¶ 16; Opinion, ¶ 23.

¶49    Our precedent informing a trial judge of the inquiry necessary when presented with a motion for substitution of counsel during trial is confusing, if not impossible to follow.  We compound that problem today by continuing to blend an ineffectiveness claim with a substitution claim.  While our precedent consistently emphasizes the need to

21

conduct an adequate initial inquiry when a motion for substitution of counsel has been made, we have been careless in articulating the standard to be applied by a trial judge in resolving such a motion. We continue in that tradition today. In some cases, our enunciated standard requires a "total lack of communication," *State v. Molder*, 2007 MT 41, ¶ 33, 336 Mont. 91, 152 P.3d 722; others a "total lack of communication *or* ineffective assistance of counsel," *Dethman,* ¶ 16, (emphasis added); and still others only an "ineffective assistance of counsel" inquiry, *Gallagher*, ¶ 24, *MacGregor*, ¶¶ 25-26.

¶50 We were urged by the State in *Cheetham* to enunciate a clear standard for substitution requests. The State referred this Court to the well-reasoned authority of federal courts and the United States Supreme Court and urged us to enunciate a clear standard. Instead, we chose to dodge the bullet by concluding it was "unnecessary to adopt a new standard in this case" because "the court's initial inquiry did not reveal serious questions as to whether [defense counsel] performed the role of counsel envisioned by the Sixth Amendment[.]" *Cheetham*, ¶ 28, n.2. As I contended in *Cheetham*, I do not know how we assess whether counsel performed "the role of counsel envisioned by the Sixth Amendment" when we fail to articulate a clear standard to assess the substitution request and continue to blend the request with an ineffective assistance of counsel claim.

¶51 In federal jurisprudence, prejudice is presumed and a per se violation of the Sixth Amendment based upon a "constructive" denial of counsel arises whenever there is (1) an irreconcilable conflict between counsel and defendant; (2) an actual conflict of interest on

22

the part of counsel; or (3) a complete breakdown in communication between counsel and the defendant. "To warrant substitute counsel, a defendant must show . . . 'a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant.'" *United States v. Swinney*, 970 F.2d 494, 499 (8th Cir.), *cert. denied*, 506 U.S. 1011, 113 S. Ct. 632 (1992) (citations omitted). *See also United States v. Allen*, 789 F.2d 90, 92 (1st Cir.), *cert. denied*, 479 U.S. 846, 107 S. Ct. 164 (1986); *United States v. Whaley*, 788 F.2d 581, 583 (9th Cir.), *cert. denied*, 479 U.S. 962, 107 S. Ct. 458 (1986). The test, which is rooted in the breakdown of the attorney-client communication sufficient enough to frustrate the original purpose of the appointment, is essentially whether the trial judge should have granted a substitution motion because of an irreconcilable conflict. *Daniels v. Woodford*, 428 F.3d 1181, 1197 (9th Cir.), *cert. denied*, 550 U.S. 968, 127 S. Ct. 2876 (2007).

¶52    In my opinion, we do a disservice to the trial courts and the litigants who appear before them, when, after observing the inappropriate practice of granting a *Gillham* order and conducting an ineffective assistance of counsel hearing during the pendency of a trial, we nonetheless persist in failing to establish a standard by which to assess the request. I would, as the federal courts have, set forth a standard warranting substitution of counsel when there is an irreconcilable conflict between counsel and defendant, a conflict of interest on the part of counsel, or a complete breakdown in communication between counsel and the defendant. In evaluating whether a court has abused its discretion in denying a substitution motion, the following circumstances are relevant: the

23

timeliness of the motion, the adequacy of the court's inquiry, and the degree to which the irreconcilable conflict has prevented the mounting of an adequate defense. *Allen*, 789 F.2d at 92; *Whaley*, 788 F.2d at 583; *Daniels*, 428 F.3d at 1197-98. I believe such a standard is premised upon sound constitutional principles underlying the Sixth Amendment and Supreme Court precedent.

¶53 For the aforesaid reasons, I specially concur in the decision reached by the Court regarding issue one. As to the remaining issues, I concur.


/S/ LAURIE McKINNON