FILED

12/15/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0352

DA 19-0352

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 310

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

TRENDTON DILLINGHAM,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 18-47A
Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Penelope S. Strong, Attorney at Law, Billings, Montana

        For Appellee:

        Timothy C. Fox, Montana Attorney General, C. Mark Fowler, Senior
Assistant Attorney General, Helena, Montana

        Marty Lambert, Gallatin County Attorney, Bjorn E. Boyer, Deputy County
Attorney, Bozeman, Montana

Submitted on Briefs:  November 18, 2020

Decided:  December 15, 2020

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Defendant Trendton Dillingham appeals his January 18, 2019 conviction of aggravated sexual intercourse without consent, which followed various pretrial expressions of a lack of confidence going to trial and a request for a continuance.  We affirm.

¶2     We restate the issue on appeal as follows:

*Did the District Court abuse its discretion in denying Defendant's request for a continuance of the jury trial and by failing to open a formal inquiry into the effectiveness of counsel following Defendant's pretrial expressions of lack of confidence?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     On February 21, 2018, Gallatin County charged Defendant Trendton Dillingham (Dillingham) with the felony of Aggravated Sexual Intercourse without Consent under § 45-5-508, MCA, in connection with an encounter between Dillingham and a woman he met through an online dating application.  On February 27, 2018, the State Public Defender appointed counsel for Dillingham.  On two occasions prior to trial, the District Court issued an Order Regarding Ex Parte Communication in response to materials Dillingham had sent to the District Court judge requesting a hearing for bail reduction and release on his own recognizance.

¶4     At a January 8, 2019 status conference, Dillingham's counsel, Annie DeWolf, indicated that, though she had recently confirmed with Dillingham that he wished to go to trial, Dillingham now wished for a continuance because he did not feel that the defense was ready for trial.  The District Court encouraged Dillingham to elaborate on the nature of his concerns, commencing a lengthy discussion.  Dillingham's statements, though at

2

times difficult to decipher, related his concerns that things had "not been disclosed" to him, that he had not "been able to really stay in complete communication about the status of what's going on here," that he had not "been given a fair situation," that the accusations and evidence against him were baseless, and that he had not been given "full confidence that [he] want[ed] to stay in trial, to feel confident to stand trial, to defend [him]self."

¶5 Dillingham stated that he had been ready to go to trial in November before being "pushed back on the back burner of the situation and not understanding completely why— of why I was being pushed back on trial" and that he did not feel that the evidence against him justified the ten months he had already spent in detention. After what appear to have been references to a prior proceeding that resulted in a plea deal and lesser included offenses, Dillingham said that he felt that "this is all being tied together of some sort" and that "it doesn't, quite frankly, add up or make any sense of anything." The District Court responded by reassuring Dillingham that there would be no evidence of prior bad acts admitted at trial.

¶6 Dillingham went on to express concern regarding publicity surrounding his prosecution, as his "character was completely blasted over the radio, the newspaper, all over social media," exposure to which he felt was the only way for "anyone to highly regard any accusation toward[]" him. The District Court responded that Dillingham raised a "very fair question" but reassured Dillingham that he would have the opportunity to ensure he had an impartial jury, unaffected by pretrial publicity, through the voir dire process. Dillingham indicated concern that this publicity could raise racial bias to undermine the

3

fairness of the proceedings, arguing that social media posts saying "Black man charged" were a "racial invective," demonstrating "bigotry going on." Dillingham concluded:

> Dillingham: All I'm saying, Your Honor, is I would like to get a very good understanding. Me and my family [are] trying to get a great understanding of what's going on in this predicament of stance, to speak to my attorneys, to figure out a game plan, so we can feel confident in moving forward.
>
> Court: So if you're wanting more time to do that—
>
> Dillingham: Yes, ma'am.
>
> Court: —my concern is that you would, then, be waiving any right to have a speedy trial, and what I'm hearing, part of your concern, is that you've been in the detention center for, as you said, 10 months, and you want this resolved.

¶7 The District Court went on to express various concerns with delaying the trial—including preserving witness memories and docketing issues—and reminded Dillingham that the State would be required to bear the burden of proving his guilt beyond a reasonable doubt to a jury at trial. Dillingham responded that he was "not worried about going to trial," as he expected to be acquitted, but went on:

> I feel very inconfident into what is going on to following up of this, now, trial date. My last acknowledge of a trial date, I didn't—when I spoke to you, last, in November, Your Honor, I thought we were just going to have a status hearing, and maybe some sort of, idealistically, maybe a dismissal, or very, very least amount, a small plea bargain. And now, the trial issue, that doesn't bother me. I'm willing to stand trial. I just want to make sure that me and my legal counsel, that's going to be standing there with me, is going to be 100 percent ready and confident that we're ready to go to trial. I feel that that's inadequate. I feel like we're not ready. I feel like we're not ready to stand a trial right now because I don't even know what we're arguing against. We haven't went over anything about none of this right now. So I would like to know what the State is wanting to bring forward at trial . . . .

4

¶8    The District Court responded that the only information the State was required to provide prior to trial was the affidavit of probable cause and the list of witnesses. The exchange continued:

> Dillingham: But I have witnesses of my own that has not been able to be subpoenaed in as well. I just—once again, I don't know exactly—I just feel that we're not confident. I don't want to go to trial. I don't want to go to trial, at this moment in time. It's not about any, of sort, of issues about anything. I just want to make sure that I'm 100 percent confident . . . .
>
> Court: If you feel like you're not ready, that your defense isn't ready—Ms. DeWolf, do you have any concerns about being ready for trial? . . . [A]re there any reasons that you feel that defense needs more time to get ready?
>
> DeWolf: I think that we've interviewed all the witnesses and we're ready to go. I understand that Mr. Dillingham wants me to call somebody as a witness, but I don't think that we would call that person as a witness, and I think we have a disagreement about it.
>
> Court: Is that witness, potentially, available for this trial, should you decide to do it?
>
> DeWolf: Yes. He's not—it's Mr. Dillingham's cousin, who lives in Ohio. He's not—he doesn't have any personal knowledge of this.

¶9    The District Court responded by explaining the requirement that trial testimony be relevant but that it would be "a decision that you have to make with your attorney, as to who to call, and why, and what their testimony might be." The District Court then turned to an unrelated evidentiary matter before returning to Dillingham's concerns:

> And I'm not aware of any other pretrial issues, other than Mr. Dillingham's concern, now, about being ready. I'm not quite sure what's best to address that, Ms. DeWolf. I think, you probably need some time with Mr. Dillingham to talk through the rationale about what witnesses to call, and when or why, or maybe have Mr. Dillingham's requested witness available and ready, and then you can make that determination during the trial.
>     I'm not quite sure how to help you with that. Mr. Dillingham, the only other thing I can tell you is that I will do my best to make sure things

5

proceed fairly, and that you have the opportunity to present whatever evidence that you feel is relevant, but it does have to be relevant. I want you to be comfortable about being ready to go to trial and so—as an example, if you had somebody that couldn't be here because they were going to be traveling or something like that, then that's different. If it's just a strategic decision that you need to make with your attorneys, but you have your witnesses available, you can make that decision as you go through the trial, and you can continue to talk about that. That's between you. So those are options that are still available to you. Again, as far as any pretrial publicity, or exposure to the facts of the other case, or exposure to any media or social media, all of those questions will be addressed during the voir dire process by counsel. I'm going to tell you that it's been the Court's experience that I'm always surprised at the fact that the majority of people don't pay attention to any of that, or don't read it or see it.

¶10 The District Court revisited Dillingham's concerns regarding pretrial publicity and juror bias, which the court deemed to be "very legitimate questions and very real concerns." The District Court again discussed how the voir dire process would enable Dillingham to screen jurors exposed to pretrial publicity. The exchange went on:

Court: As best I understand your concerns, I don't think there's a basis to continue the trial. If you talk to Ms. DeWolf and you still feel that there's something there, then she can file that motion, and we'll look at that. My biggest concern of all of the things you raised today, is that I don't want you to have to extend the trial and waive your right to a speedy trial because that is one of your concerns.

Dillingham: Yes, it is.

Court: And I think that, of all things, that's a very critical one.

Dillingham: I want to be organized, and I want to be proper, and I don't want to wait until the last moment, and then not know where—that was an issue. Well, now, I feel inconfident about this situation.

¶11 The District Court reassured Dillingham that if "anything new or different than what [he] already [knew]" came up at trial, his counsel would make a motion to address it. The

6

District Court concluded: "So visit with Ms. DeWolf about all that, and then she can file a motion if you still feel uncomfortable."

¶12 The District Court went on to explain the issue of lesser included offenses, to which Dillingham responded that the system was "one or the other, Your Honor. Did you run the red light, or you didn't? You didn't go through it at yellow." He went on: "you can't do half of something. You know what I mean? There's no, 'It didn't go to that extent.' No, it's that or nothing . . . ." The District Court acknowledged this concern. Before the conclusion of the hearing, the State responded to Dillingham's apparent earlier reference to a plea deal:

> State: [T]he Defendant made some—just an [a]llusion to wanting some sort of plea offer, or plea agreement. So I just wanted to make sure that it's on the record that the State was in negotiations with Ms. DeWolf, regarding a plea agreement that contemplated amending the charge down to a sexual assault felony, which would have limited the Defendant's exposure to five years. As he's charged, if he's convicted of what he's charged with, there's a mandatory minimum of 10 years. So I just wanted to make sure—it sounded like, maybe—I don't know if he's heard that, or that we were in those negotiations or not, I just want to make sure that the Defendant was aware of that and that's something that he's not accepting.

> Court: Okay. So you understand, Mr. Dillingham, that there have been negotiations?

> Dillingham: Yes, I just heard that, ma'am.

> Court: All right. So, again, that's something you need to discuss with Ms. DeWolf, and those negotiations aren't anything that the Court considers. That['s] between the parties and the Court doesn't consider that, unless you decide that you want to do a change of plea, similar to last time. So that's for you to consider, but [the State] just wants to make sure that you have personal knowledge about those negotiations, and that you're participating in those with Ms. DeWolf. Does that make sense?

> Dillingham: Yes, ma'am.

7

¶13 The court concluded the status conference: "So unless we hear otherwise, Ms. DeWolf, we'll be ready for trial next Wednesday." After a three-day jury trial, Dillingham was convicted of Aggravated Sexual Intercourse without Consent and sentenced to ten years in prison, with two years suspended. This appeal followed.

## STANDARD OF REVIEW

¶14 A district court's decision on a motion for continuance is reviewed on appeal for abuse of discretion. Section 46-13-202, MCA; *State v. Haskins*, 255 Mont. 202, 207, 841 P.2d 542, 545 (1992). A district court's ruling on a defendant's request for substitution of appointed counsel is also reviewed for abuse of discretion. *State v. Aguado*, 2017 MT 54, ¶ 8, 387 Mont. 1, 390 P.3d 628. Both the procedures used by the district court during the initial consideration of a defendant's complaints regarding counsel and the district court's analysis of whether those claims are seemingly substantial, necessitating further inquiry, are reviewed for abuse of discretion. *State v. Schowengerdt*, 2018 MT 7, ¶ 16, 390 Mont. 123, 409 P.3d 38 (citations omitted).

## DISCUSSION

¶15 *Did the District Court abuse its discretion in denying Defendant's request for a continuance of the jury trial and by failing to open a formal inquiry into the effectiveness of counsel following Defendant's pretrial expressions of lack of confidence?*

¶16 Represented by new counsel on appeal, Dillingham argues that his lengthy exchange with the District Court during the pre-trial status conference demonstrated that he had "seemingly substantial" complaints regarding his counsel—including unpreparedness for trial, strategy disagreements, and poor communications—necessitating a hearing on the

8

matter. Relatedly, Dillingham argues that the District Court should have granted his request for continuance.

¶17 Criminal defendants have a constitutionally guaranteed right to effective assistance of counsel. *City of Billings v. Smith*, 281 Mont. 133, 136, 932 P.2d 1058, 1060 (1997) (citing U.S. Const. amend. VI; Mont Const. art. II, § 24). When a defendant requests substitute counsel, the trial court must undertake an "adequate initial inquiry" into the "defendant's factual complaints together with counsel's specific explanations addressing the complaints" to determine whether the defendant's concerns are "seemingly substantial." *State v. Johnson*, 2019 MT 34, ¶¶ 21-22, 394 Mont. 245, 435 P.3d 64. If the court finds "seemingly substantial" concerns regarding the effectiveness of counsel, the court must go on to hold a hearing on the matter and determine whether substitute counsel is necessary. *Johnson*, ¶¶ 21-22. The district court's inquiry is adequate so long as the court "considers" these complaints and explanations; a failure to conduct "even a cursory inquiry" is inadequate. *Schowengerdt*, ¶ 17.

¶18 The threshold question, then, is whether Dillingham put the District Court on notice that the effectiveness of Dillingham's counsel was at issue. Dillingham need not make a formal motion titled a "Request for Substitution of Counsel" to trigger the District Court's duty to make an adequate inquiry; the District Court should look to the content, rather than the form, of a defendant's statements on the matter. *Smith*, 281 Mont. at 139, 932 P.2d at 1061-62. During the status conference, Dillingham voiced his frustrations with his experience being placed within the criminal justice system, generally, but did not expressly challenge the effectiveness of his representation or request a substitution of counsel.

9

Dillingham argues on appeal, however, that some of his raised concerns indirectly implicated the effectiveness of his counsel and triggered the District Court's duty to conduct an adequate initial inquiry into the matter. In particular, Dillingham points to his allegations at the status conference that he had been unable to "stay in complete communication about the status of what's going on" and that he did not feel confident and "ready to stand a trial" in addition to defense counsel's disclosure of a disagreement between Dillingham and his attorney regarding whether to call a particular witness.

¶19 Dillingham did not elaborate on his comments that things had "not been disclosed" to him and that he had not "been able to really stay in complete communication about the status of what's going on here." Dillingham may have been referring to the prior District Court orders responding to his efforts to make ex parte communications directly to the District Court judge. Alternatively, perhaps he was referring to his expressed frustration that he did not know what the testimony of the State's witnesses would be at trial. Regardless, he made no indication that he was referring to communications with his appointed counsel. These passing comments, made in the context of Dillingham's extensive expression of generalized dissatisfaction and without supporting factual allegations, do not rise to the level imposing a duty on the District Court to inquire into the effectiveness of Dillingham's counsel.

¶20 Dillingham argues on appeal that the discussion regarding the existence of plea offers suggested that Dillingham's counsel had failed to communicate these matters to Dillingham. When questioned by the District Court on whether he understood that there had been plea negotiations, Dillingham responded: "Yes, I just heard that, ma'am." It is

10

unclear whether Dillingham's response was intended to merely confirm his present attentiveness or if it indicated that he had not been—or did not recall being—made aware of these plea negotiations earlier by his defense counsel. To the extent that this lone statement raised any concerns regarding the effectiveness of Dillingham's counsel in communicating critical information with him, the District Court adequately inquired into and remedied the concern by ensuring that Dillingham understood the opportunity for a plea deal and instructing him to discuss the matter further with his counsel.

¶21 Likewise, defense counsel's disclosure of a disagreement with Dillingham over whether to call Dillingham's cousin as a witness was not accompanied by any allegations or facts indicating that the dispute had developed into a significant breakdown in communication and the attorney-client relationship. Dillingham's attorney presented legitimate reasons for not wishing to call that particular witness. To the extent that Dillingham's statement did raise any concerns, the District Court adequately responded by discussing evidentiary relevancy requirements with Dillingham and by encouraging him to continue talking with his counsel about further development of trial strategy.[1]

¶22 Dillingham also argues on appeal that his repeated comments that he lacked "full confidence" with which to go to trial because he felt "like we're not ready" constituted an

---

[1] Dillingham also argues that this discussion constituted confidential matters of defense trial strategy from which the prosecution should have been excluded. *See United States v. Valezquez*, 855 F.3d 1021, 1034 (9th Cir. 2017). This discussion consisted of defense counsel's statement that Dillingham's cousin was available to testify but lacked personal knowledge of the event; the District Court's explanation of the evidentiary relevancy requirement; and Dillingham's various statements about having "first-party person[s]" and "third-party persons" to speak on his behalf, and that his roommate, who was already under subpoena, was in his home at the time of the alleged crime. The transcript demonstrates that these various statements did not amount to confidential matters of defense trial strategy requiring the exclusion of the State for an in camera inquiry.

11

allegation of unpreparedness on the part of his defense counsel, thereby putting the District Court on notice of an effectiveness of counsel issue. During the status conference, Dillingham described a number of concerns that could potentially underly his lack of "full confidence" in going to trial, including prejudicial pretrial publicity, racial bias, admissibility of prior bad acts, uncertainty regarding what evidence the State would bring, and what Dillingham viewed as the criminal justice system's tendency to see the world in terms of only red and green traffic lights, with no room for yellow. Notably absent from these listed concerns was any indication that he believed that his counsel was unprepared and therefore ineffective. The general gist of Dillingham's comments was that he did not feel ready to go to trial because he lacked confidence, not in the ability of his attorneys, but in the criminal justice system generally. The transcript shows that the District Court responded appropriately by attentively listening to and crediting Dillingham's "very legitimate" concerns, eliciting more information to further develop and consider them, and addressing whether the trial procedures in place would effectively allay these concerns and ensure that Dillingham received a fair trial.

¶23 Even if Dillingham's lack of confidence did constitute a request for substitute counsel, the District Court's response was an "adequate initial inquiry" to determine whether Dillingham's concerns were "seemingly substantial." *Johnson*, ¶¶ 21-22. Throughout this discussion, the District Court considered Dillingham's many "factual complaints" at length and solicited defense counsel's "specific explanations" as to whether defense was prepared for trial. *Johnson*, ¶ 21. The District Court here considered

12

Dillingham's concerns, often encouraging him to clarify and expand upon them where possible, and responded thoughtfully.

¶24 The present case is in sharp contrast to *Smith*, where the defendant explicitly and repeatedly stated that he believed his current counsel was ineffective due to specified shortfalls, that he wished to have substitute counsel, and that he wished to delay the trial until he had found new counsel. *Smith*, 281 Mont. at 139-40, 932 P.2d at 1062. The district court in *Smith* refused to even consider these issues in denying the defendant's requests. *Smith*, 281 Mont. at 140, 932 P.2d at 1062. Here, Dillingham never claimed that his counsel was ineffective or that he wished for new counsel. Nor did he relate concerns or facts that would put the District Court on notice that Dillingham was potentially not being afforded the effective assistance of counsel to which he was constitutionally entitled. Unlike the court in *Smith*, the District Court here engaged in a meaningful consideration of Dillingham's concerns.

¶25 Similarly, the District Court did not abuse its discretion by failing to conclude that Dillingham had raised "seemingly substantial" concerns regarding the effectiveness of his counsel. Defense counsel stated that the defense was prepared for trial and Dillingham alleged no facts demonstrating otherwise. The status conference demonstrated that Dillingham's various iterations of the sentiment "I feel like we're not ready" were reflective of his own personal apprehension of going to trial, not the preparedness or effectiveness of his appointed counsel. As described above, any concerns that Dillingham's attorneys were not communicating properly with him were not substantially supported by any information developed at the status conference.

13

¶26 Finally, the District Court did not abuse its discretion by declining to grant Dillingham's request for a continuance before trial. As noted above, the District Court properly engaged in a detailed discussion with Dillingham, considering a variety of concerns underlying his assertion that he was not ready for trial. The District Court diligently addressed each of his articulated concerns, none of which could be remedied by a delay, and provided reasoned assurance that Dillingham would receive a fair trial. The District Court further noted the importance of preserving Dillingham's right to a speedy trial, preventing witness memories from fading, and properly managing the court's docket. Moreover, Dillingham expressed concern about spending months in jail prior to trial. These considerations and the subsequent decision were well within the District Court's discretion.

## CONCLUSION

¶27 To the extent that Dillingham's comments raised any questions regarding his counsel's effectiveness, the District Court conducted an adequate inquiry by diligently addressing each of these concerns in an appropriate manner. The District Court did not abuse its discretion in failing to find any such concerns of ineffective assistance of counsel "seemingly substantial," nor did the court abuse its discretion by declining to grant a trial continuance.

¶28 Affirmed.

/S/ MIKE McGRATH

14

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE