Justice Laurie McKinnon delivered the Opinion of the Court.
***7 ¶ 1 A jury found Randall Bryce Walker (Walker) guilty of two counts of incest and *205 two counts of sexual assault. The Twenty-First Judicial District Court, Ravalli County, sentenced Walker to four, 100-year concurrent prison sentences, with no time suspended. Walker appeals, presenting three evidentiary issues for our review:
1. Did the District Court abuse its discretion in excluding the defendant's polygraph evidence?
2. Did the District Court abuse its discretion in excluding a defense expert's testimony that the defendant's psychosexual profile revealed no sexual interest in children?
3. Did the District Court correctly apply Montana's Rape Shield Law, § 45-5-511(2), MCA, to exclude evidence of a victim's alleged prior sexual conduct?
¶ 2 We affirm.
FACTUAL AND PROCEDURAL BACKGROUND
¶ 3 Walker married A.W.'s mother, Kim, when A.W. was an infant. A.W. later disclosed that, when she lived with Walker, he subjected her to a series of sexual assaults, beginning when she was seven or eight years old and ending when she was twelve or thirteen years old. She testified at trial that Walker frequently and regularly sexually assaulted her. Walker and Kim divorced in 2007. The next year, Walker married Laura. Laura's two daughters, B.W. and R.W., lived with Walker and Laura. Walker and R.W. did not have a good relationship. R.W. testified that Walker constantly made her uncomfortable by doing things like smacking and grabbing her bottom and trying to kiss her on the lips.
¶ 4 R.W. and B.W. both participated in competitive archery. A tournament took place near their home on February 14, 2015. At that time, R.W. was eleven years old. Early that morning, around 6:00 a.m., Laura and B.W. left to help set up the tournament, leaving Walker and R.W. alone at home. R.W. and Walker planned to meet B.W. and Laura at the tournament. Walker and R.W. each testified at trial, recounting different versions of what occurred that morning.
***8 ¶ 5 R.W. testified that, after she woke up, she went to Walker and Laura's bedroom, where Walker was lying in bed. R.W. crawled into the bed on the side where her mother usually slept. She testified that she did so because she wanted to wake up a little bit before she got ready for the tournament, but thought she would fall back asleep if she stayed in her own bed. R.W. then explained, in detail, how Walker initiated sexual contact with her. Walker, on the other hand, testified that R.W. made sexual advances at him and that, as soon as he realized what was happening, he jumped out of the bed. R.W. and Walker went to the archery tournament later that morning.
¶ 6 The State charged Walker with two counts of felony incest and two counts of felony sexual assault based on Walker's ongoing conduct towards A.W. when she was his step-daughter and Walker's conduct towards R.W. on February 14, 2015, when she was his step-daughter. Walker denied all charges and maintained his innocence.
¶ 7 In preparing his defense, Walker voluntarily underwent a psychosexual evaluation with Dr. Robert Page (Dr. Page). Walker sought to have Dr. Page testify at trial as to the results of his psychosexual evaluation. Walker made an offer of proof, representing to the District Court that Dr. Page would testify that "Walker's [psychosexual] profile is that he is not sexually interested in school-age males or females, or preschool age males or females" and that Walker showed "no signs of psychopathology or personality pathology." Dr. Page would further testify that he had no therapeutic recommendations for Walker.
¶ 8 Walker also voluntarily took a polygraph test with Dick Stotts (Stotts). Stotts examined Walker pursuant to the American Polygraph Association's standard polygraph procedure. During the polygraph test, Stotts asked Walker whether he ever had sexual contact with underage children generally or with R.W. particularly. Walker denied having any such contact. Stotts subsequently issued a report, in which he indicated that Walker's "polygrams did not contain specific reactions to the relevant questions, indicating no attempt at deception." Stotts further concluded, *206 "After careful analysis of [Walker's] polygrams, it is the opinion of the examiner that [Walker] told the truth during his examination." Walker planned to have Stotts testify about the polygraph test's results at his trial.
¶ 9 The State filed pre-trial motions to exclude Dr. Page's and Stotts's testimony. The District Court accepted briefing on the issues and ultimately granted the State's motions. Walker's case proceeded to a jury trial in August 2016. At trial, Walker planned to have Stacy Wood (Wood) testify about alleged past sexual contact between victim R.W.
***9 and a three-year-old. Walker represented that Wood planned to testify about a time when she found eight-year-old R.W. in bed with the three-year-old, allegedly engaging in sexual conduct initiated by R.W. The State asked the District Court to exclude Wood's testimony pursuant to Montana's Rape Shield Law, § 45-5-511(2), MCA. The District Court heard the parties' arguments and subsequently granted the State's motion to exclude Wood's testimony.
¶ 10 After five days of trial, the jury found Walker guilty on all four counts. The District Court sentenced Walker to four, 100-year concurrent prison sentences, with no time suspended. Walker appeals, arguing that the District Court improperly excluded Dr. Page's, Stotts's, and Wood's testimony.
STANDARD OF REVIEW
¶ 11 District courts have broad discretion in determining the relevance and admissibility of evidence. State v. Daffin , 2017 MT 76, ¶ 12, 387 Mont. 154, 392 P.3d 150. Thus, we review evidentiary rulings for an abuse of discretion. State v. Madplume , 2017 MT 40, ¶ 19, 386 Mont. 368, 390 P.3d 142. A court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. State v. Spottedbear , 2016 MT 243, ¶ 9, 385 Mont. 68, 380 P.3d 810. In exercising its discretion, however, a district court is bound by the Rules of Evidence and applicable statutes. State v. Derbyshire , 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. Consequently, to the extent the court's ruling is based on its interpretation of an evidentiary rule or statute, our review is de novo. Derbyshire , ¶ 19.
DISCUSSION
¶ 12 1. Did the District Court abuse its discretion in excluding the defendant's polygraph evidence?
¶ 13 Walker included polygraph examiner Stotts on his list of potential trial witnesses and provided the State with a copy of Stotts's polygraph report. The State filed a pretrial motion, seeking to exclude Stotts as a trial witness and prohibit any reference to the polygraph examination by any attorney, party, or witness. The State based its motion on a line of precedent from this Court excluding polygraph evidence from all court proceedings. See, e.g. , State v. Hameline , 2008 MT 241, ¶ 20, 344 Mont. 461, 188 P.3d 1052 ; State v. Anderson , 1999 MT 58, ¶ 12, 293 Mont. 472, 977 P.2d 315 ; State v. Staat , 248 Mont. 291, 293, 811 P.2d 1261, 1262 (1991).
***10 ¶ 14 Walker opposed the State's motion but did not mention Stotts's testimony or the precedent upon which the State relied. Instead, Walker asserted that his offer to take the polygraph examination was admissible. Walker stated, "If Walker testifies, he will seek to offer the fact he volunteered to take the polygraph test as evidence relevant to his state of mind-more specifically, evidence relevant to his consciousness of innocence." (Emphasis added.) Walker further argued that, because the jury would know that he offered to take the polygraph examination, it would also need to know the examination's results. He urged the District Court to consider the interaction of M. R. Evid. 403, 404, 608, and 702 in deciding whether the polygraph examination's results should be admitted. Walker asserted that each side should "present evidence concerning the general science of polygraph evidence" to assist the court in determining whether the results were admissible under M. R. Evid. 702. Walker further stated that, if the State impeached his testimony, he would use the polygraph examination results to corroborate his truthfulness.
¶ 15 The District Court granted the State's pretrial motion to exclude Stotts's testimony *207 and prohibit any attorney, party, or witness from referencing the polygraph examination. In its order, the court recognized the disparity between what the State requested and what Walker argued: "Walker fails to address, or even acknowledge, the Montana Supreme Court's bright line prohibition of polygraph evidence.... Instead, he contends the issue of the admissibility of an offer to take a polygraph test has not yet been addressed by the Montana Supreme Court." (Emphasis in original.) The District Court found Walker's argument unpersuasive in view of this Court's precedent clearly prohibiting polygraph evidence. Walker appeals the District Court's decision, arguing it should have admitted the polygraph evidence pursuant to M. R. Evid. 702.
¶ 16 We begin our analysis by noting that there are two distinct types of polygraph evidence at issue here. The first type involves the admissibility of Walker's polygraph test results through Stotts's expert testimony pursuant to M. R. Evid. 702. The second type of evidence concerns Walker's offer to take the polygraph test, which does not involve expert testimony or implicate considerations of M. R. Evid. 702. In his argument to the District Court, Walker argued that his offer itself should be admissible, but we do not discern a similar argument on appeal. Walker only mentions his offer in passing, urging us to "consider" the fact that he "willingly submitted" to the polygraph test. Accordingly, our decision only addresses the argument Walker raises on appeal-admissibility of polygraph test results pursuant to ***11 M. R. Evid. 702. We do not consider Walker's ancillary argument concerning the admissibility of his offer to take a polygraph test, which would involve evidentiary considerations other than M. R. Evid. 702.
¶ 17 Walker urges us to depart from our precedent holding that polygraph test results are inadmissible and apply, instead, general standards for admitting expert opinion evidence. The analysis of whether to admit or exclude expert testimony begins with M. R. Evid. 702, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
Our jurisprudence recognizes that expert evidence is admissible if the expert field is reliable, the expert is qualified, and the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. McClue v. Safeco Ins. Co. , 2015 MT 222, ¶¶ 21-23, 380 Mont. 204, 354 P.3d 604 ; M. R. Evid. 702. Walker asks us to reconsider the scientific reliability of polygraph testing.
¶ 18 This Court has long held that polygraph test results are inadmissible in all Montana court proceedings. See, e.g. , Hameline , ¶ 20 ("We repeat yet again our blanket prohibition on the use of polygraph test results in any way in any Montana court proceeding."); State v. DuBray , 2003 MT 255, ¶ 105, 317 Mont. 377, 77 P.3d 247.[1] The prohibition on polygraph test results extends to a defendant's sentencing. See, e.g. , Anderson , ¶ 12 ; State v. Hensley , 250 Mont. 478, 482-83, 821 P.2d 1029, 1032 (1991). Even the indirect admission of polygraph test results is prohibited. Anderson , ¶ 12 (stating that "any evidence which would otherwise be admissible may be rendered inadmissible where a polygraph is used in the production of or for the purpose of influencing the outcome of such evidence"); In re N.V. , 2004 MT 80, ¶ 20, 320 Mont. 442, 87 P.3d 510 (emphasizing that "polygraph results, even if indirectly presented to a district court, are inadmissible"); State v. Craig , 262 Mont. 240, 242-43, 864 P.2d 1240, 1242-43 (1993). The only instances in which we permit polygraph testing is when a court imposes therapeutic polygraph testing as a probation condition. See, e.g. , ***12 State v. Smart , 2009 MT 1, ¶ 12, 348 Mont. 274, 201 P.3d 123 ; State v. Heddings , 2008 MT 402, ¶ 20, 347 Mont. 169, 198 P.3d 242 ; Hameline , ¶¶ 19-20. *208 ¶ 19 While frequently premised upon a determination that polygraph examinations are unreliable, this strict prohibition also stems from a concern that polygraph test results invade the province of the fact-finder by improperly commenting on a witness's or defendant's credibility. State v. Bashor , 188 Mont. 397, 414-16, 614 P.2d 470, 480-81 (1980) (citing United States v. Alexander , 526 F.2d 161, 168-69 (8th Cir. 1975) ). In Bashor , we held that when a polygraphist testifies about polygraph test results, that person directly comments on "the determinative factor as to the guilt or innocence of a defendant in a jury-tried case." Bashor , 188 Mont. at 414, 614 P.2d at 480 (quoting Alexander , 526 F.2d at 168 ). That testimony "deprive[s] the defendant of the common sense and collective judgment of his peers, derived after weighing facts and considering the credibility of witnesses, which has been the hallmark of the jury tradition." Bashor , 188 Mont. at 414, 614 P.2d at 480 (quoting Alexander , 526 F.2d at 168 ). In Alexander , the Eighth Circuit Court of Appeals explained:
The most important function served by a jury is in bringing its accumulated experience to bear upon witnesses testifying before it, in order to distinguish truth from falsity. Such a process is of enormous complexity, and involves an almost infinite number of variable factors. It is the basic premise of the jury system that twelve men and women can harmonize those variables and decide, with the aid of examination and cross-examination, the truthfulness of a witness. But a [polygraph] machine cannot be examined or cross-examined; ... [The court is] not prepared to rule that the jury system is as yet outmoded. [The court prefers] the collective judgment of twelve men and women who have sat through many weeks of a trial and heard all the evidence on the guilt or innocence of a defendant.
Alexander , 526 F.2d at 168-69 (quoting United States v. Stromberg , 179 F.Supp. 278, 280 (S.D.N.Y. 1959) ); see also United States v. DeBetham , 348 F.Supp. 1377, 1390-91 (S.D. Cal.), aff'd , 470 F.2d 1367 (9th Cir. 1972). In many ways, an "aura of infallibility" accompanies polygraph test results, which "can lead jurors to abandon their duty to assess credibility and guilt" and, instead, rely on the examiner's expert opinion. United States v. Scheffer , 523 U.S. 303, 314, 118 S.Ct. 1261, 1267, 140 L.Ed.2d 413 (1998). Consistent with this reasoning, "[t]he only acceptable lie detection methods in Montana court proceedings reside with the court in bench trials, the jury in jury trials, and the skill of counsel in ***13 cross-examination in all trials." Staat , 248 Mont. at 293, 811 P.2d at 1262.
¶ 20 There is a distinction between polygraph test results and most other types of admissible scientific evidence. Bashor , 188 Mont. at 414-16, 614 P.2d at 480-81. After the jury receives other types of scientific expert testimony, such as fingerprint comparisons or handwriting analyses, it "has the additional responsibility of reviewing other facts which tend to prove or disprove [a] defendant's connection with the crime and, if participation is shown, the jury may further ... ascertain the defendant's mental state at the time of the crime...." Bashor , 188 Mont. at 415, 614 P.2d at 480 (quoting Alexander , 526 F.2d at 169 ). A polygraphist's testimony, on the other hand, comments directly on the question the jury must answer: "Is the defendant innocent or guilty?" Bashor , 188 Mont. at 415, 614 P.2d at 481 (quoting Alexander , 526 F.2d at 169 ). "If the expert testimony is believed by the jury, a guilty verdict is usually mandated." Bashor , 188 Mont. at 415, 614 P.2d at 480 (quoting Alexander , 526 F.2d at 169 ). Presentation of scientific expert testimony that the defendant credibly denied committing the offense goes to the issue of the defendant's guilt or innocence.
¶ 21 It has been stated that a polygraphist opines only to the truth or falsity of an accused's responses and does not comment on the guilt or innocence of the defendant. United States v. Zeiger , 350 F.Supp. 685, 691 (D.D.C.), rev'd , 475 F.2d 1280 (D.C. Cir. 1972). However, that distinction is illusory, as recognized in Alexander , 526 F.2d at 168, n.14. If the polygraphist asks the defendant properly phrased questions about relevant facts and elements of the crime, and the polygraphist then testifies at trial that the defendant's responses were not fabricated, the testimony's import is clear. The jury may easily draw an implicit conclusion that the *209 defendant did not commit the crime for which he is charged.
¶ 22 Although perhaps subtle, there is thus a fundamental difference between polygraph test results and other types of scientific evidence. Here, Walker seeks to introduce, through scientific expert testimony, polygraph test results to establish that he is telling the truth about his innocence. We conclude the purpose for which the evidence is being offered, to show that Walker is credible when he says he is innocent, invades matters that are clearly committed to the province of the jury. First, it bolsters Walker's credibility; second, it speaks to Walker's guilt or innocence. Thus, apart from considerations of M. R. Evid. 702, the evidence is inadmissible. Even if polygraph ***14 examinations were deemed reliable, evidence of polygraph test results improperly comments on a witness's credibility and invades the province of the jury. A jury must decide the guilt or innocence of a defendant, and it was exclusively within the province of the jury to weigh the credibility and veracity of each witness at Walker's trial. See Bashor , 188 Mont. at 416, 614 P.2d at 481. We find no basis to depart from the sound reasoning expressed in our precedent that polygraph test results invade the province of the jury and are inadmissible in all Montana court proceedings.
¶ 23 Finally, we find it prudent to address Walker's argument that the Legislature's 1995 repeal of a 1983 statute demonstrates the Legislature's intent for polygraph test results to be admissible. In 1983, the Legislature enacted § 37-62-302, MCA (1983), entitled "Inadmissibility of results as evidence," which provided, "Results of a polygraph examination or other test given by an examiner may not be introduced or admitted as evidence in a court of law." 1983 Mont. Laws 370. In 1995, the Legislature repealed the professional and occupational licensing statutes that contained § 37-62-302, MCA (1983). Walker argues that the Legislature's repeal demonstrates its intent to have polygraph evidence treated the same way as other forms of expert witness testimony. Walker's argument is, however, unpersuasive, as our precedent excluding polygraph test results predated § 37-62-302, MCA (1983), and we continue to apply the same principles post-repeal. See, e.g. , State v. Beachman , 189 Mont. 400, 404, 616 P.2d 337, 339 (1980) (concluding polygraph test results were inadmissible because the witness's credibility was not "a fact in issue"); Bashor , 188 Mont. at 416, 614 P.2d at 481 ; State v. Campbell , 176 Mont. 525, 530, 579 P.2d 1231, 1234 (1978) ; State v. Cor , 144 Mont. 323, 349-50, 396 P.2d 86, 100 (1964). However, more importantly, it is this Court's responsibility to protect the integrity of the fact-finding process and to maintain the important function served by the jury. The trial process-counsel's presentation of evidence and examination and cross-examination of witnesses-allows the jury to assess the credibility of each witness and arrive at a collective judgment of guilt or innocence. The judiciary is charged with maintaining the integrity of the trial.
¶ 24 Accordingly, consistent with our well-established precedent, we reiterate the "simple rule of law" previously stated in Staat : "Polygraph evidence shall not be allowed in any proceeding in a court of law in Montana." Staat , 248 Mont. at 293, 811 P.2d at 1262. We affirm the District Court's order excluding Walker's proffered ***15 polygraph evidence.
¶ 25 2. Did the District Court abuse its discretion in excluding a defense expert's testimony that the defendant's psychosexual profile revealed no sexual interest in children?
¶ 26 Walker planned to have Dr. Page testify about the results of Walker's psychosexual evaluation at trial. Specifically, Walker sought to have Dr. Page testify that Walker's psychosexual profile demonstrated Walker had no sexual interest in children; that Walker did not show any signs of psychopathology or personality pathology; and that Dr. Page did not have any therapeutic recommendations for Walker. The State filed a pre-trial motion to exclude Dr. Page's testimony regarding the results of Walker's psychosexual evaluation, arguing the testimony would improperly bolster Walker's credibility.
*210 ¶ 27 Walker responded, arguing Dr. Page's testimony would not directly bear on Walker's credibility as a witness but would, instead, undermine the State's factual theory that Walker had sexual contact with the victims. Walker reasoned that evidence showing he is not psychologically inclined to be sexually gratified by children would render it less probable that he knowingly had sexual contact with the victims. After considering each party's briefing, the District Court agreed with the State and excluded the testimony.[2]
¶ 28 Walker now appeals the District Court's decision, arguing it improperly excluded Dr. Page's testimony. Walker sought to examine ***16 Dr. Page as an expert witness. Walker asserts Dr. Page would not have offered evidence concerning any witness's credibility, but instead would have simply offered a "clinical finding that, in his professional opinion, Walker's psychosexual traits include no sexual interest in ... children." Walker contends Dr. Page's evaluations of Walker's psychosexual characteristics would have assisted the jury in determining a fact in issue-whether Walker knowingly had sexual contact with either victim. The State argues that, instead of helping the jury, Dr. Page's testimony would have invaded its province by improperly bolstering Walker's credibility.
¶ 29 In his oral argument before this Court, Walker distinguished between "characteristics" and "character traits," reasoning that Dr. Page would have commented only on Walker's "characteristics," not on his "character traits." Walker specifically stated during argument that he was not advancing Dr. Page's testimony as character evidence pursuant to M. R. Evid. 404(a)(1), which allows an accused to offer evidence of a pertinent character trait. Instead, Walker argues his psychosexual profile evidence should be admitted pursuant to M. R. Evid. 702.[3]
¶ 30 We view the evidence offered by Walker-that based on interviews and psychological testing, he does not fit the profile of a person sexually interested in children-as comparable to Walker's attempt to admit the results of a favorable polygraph test, which is also administered and interpreted by an expert. Evidence of favorable polygraph test results addresses the truthfulness of a witness, a determination exclusively within the province of the fact finder at trial. Similarly, a clinical finding by Dr. Page that, in his professional opinion, "Walker's profile is that he is not sexually interested in school-age males or females, or preschool age males or females" is scientific evidence supporting the notion that because Walker does not fit a profile of a pedophile he must be innocent of the sexual assaults. Both are attempts to *211 bolster the credibility of a witness; both speak directly to the guilt or innocence of the defendant; and both invade the ***17 exclusive province of the jury to judge credibility and the guilt or innocence of the accused.
¶ 31 Our precedent addressing the admissibility of profile evidence consists primarily of three cases: State v. Bailey , 2004 MT 87, 320 Mont. 501, 87 P.3d 1032 ; State v. Spencer , 2007 MT 245, 339 Mont. 227, 169 P.3d 384 ; and State v. Passmore , 2010 MT 34, 355 Mont. 187, 225 P.3d 1229. We address each, and examine them in the context of Dr. Page's proffered testimony.
¶ 32 In Bailey , the State charged Bailey with incest for sexually assaulting his step-daughters. Bailey , ¶ 9. Before his trial, Bailey underwent a psychosexual evaluation with Dr. Scolatti. Bailey , ¶ 35. Thereafter, Bailey sought to have Dr. Scolatti testify at his trial regarding the evaluation's results and Dr. Scolatti's opinion of the results. Bailey , ¶ 35. The district court excluded Dr. Scolatti's testimony and we affirmed on appeal, noting that Bailey offered Dr. Scolatti's testimony to bolster his own claim that he did not commit the alleged offenses. Bailey , ¶ 38. We reasoned:
Expert testimony offered to bolster the credibility of a party and his or her claims is improper because it invades the province of the jury by "placing a stamp of scientific legitimacy on a victim's allegations, or by dismissing the validity of the allegations."
Bailey , ¶ 38 (quoting Benjamin v. Torgerson , 1999 MT 216, ¶ 40, 295 Mont. 528, 985 P.2d 734 ) (emphasis added).
¶ 33 In this case, the State urged the District Court to find that Bailey controlled, commenting that "[t]he only purpose to Dr. Page's testimony is to present the outcome of the testing and his opinion of [Walker's] potential to be a sex offender-in other words, to attempt to bolster [Walker's] credibility." The District Court agreed with the State, determining that Dr. Page's testimony in Walker's case was akin to Dr. Scolatti's testimony in Bailey . For that reason, the court excluded the profile evidence, remarking on "Walker's artful attempt to argue that he does not seek to offer such evidence to bolster his credibility, but rather to undermine the State's theory that he committed the crimes with which he [was] charged."
¶ 34 We agree with the District Court that, as in Bailey where Dr. Scolatti's testimony would have improperly bolstered Bailey's own claim that he did not commit the alleged offenses, Dr. Page's testimony would have improperly bolstered Walker's own claim that he did not commit the alleged offenses. See Bailey , ¶ 38. Bolstering a witness's testimony with profile evidence is inappropriate because it invades the province of the jury, as the jury alone is responsible for weighing the ***18 witnesses' credibility. See M. R. Evid. 608 (providing that a witness's credibility may be supported with evidence of his truthful character "only after the character of the witness for truthfulness has been attacked...."). Admitting the profile evidence would have invaded the province of the jury by "placing a stamp of scientific legitimacy" on Walker's denial of the victims' accusations. See Bailey , ¶ 38.
¶ 35 In Spencer , the State charged Spencer with two counts of sexual intercourse without consent for sexually assaulting his daughter and stepdaughter. Spencer , ¶¶ 6, 9. Spencer underwent a psychosexual evaluation with Dr. Scolatti and subsequently sought to introduce Dr. Scolatti's testimony at trial that "Spencer lacked the diagnostic criteria of a pedophile." Spencer , ¶¶ 10, 35. Spencer sought to admit Dr. Scolatti's testimony to "generally rebut the mental states of purposely and knowingly"; he argued "that because he was diagnosed as not being a pedophile, he could not have the requisite intent" to commit the crimes. Spencer , ¶ 38.
¶ 36 The district court excluded Dr. Scolatti's testimony, stating that "the testimony was distinctly not about [Spencer's] mental condition but about his not being a member of a diagnostic group-pedophiles." Spencer , ¶ 38 (internal quotations omitted). The district court reasoned that Spencer lacking the diagnostic criteria of a pedophile "was less a diagnosis of mental condition" and more a commentary regarding whether Spencer "was or was not includable in that grouping called pedophiles and thus whether he could *212 or could not exhibit behaviors of members or non-members of that class." Spencer , ¶ 38. The district court concluded that Spencer's mental state was "a matter for the province of the jury." Spencer , ¶ 38. We affirmed the district court's rationale and its exclusion of Dr. Scolatti's testimony. Spencer , ¶ 39. We added that "we question the relevance of Dr. Scolatti's testimony and whether it could have assisted the trier of fact." Spencer , ¶ 39. We concluded that "whatever relevance Dr. Scolatti's testimony may have possessed, the dangers of confusing the issues or misleading the jury substantially outweighed its probative value, and thus it ran afoul of M. R. Evid. 403." Spencer , ¶ 41.
¶ 37 In this case, Walker sought to introduce profile evidence bearing remarkable resemblance to the testimony by Dr. Scolatti that Spencer sought to introduce. Dr. Page would have testified that Walker's psychosexual profile demonstrated Walker had no sexual interest in children; essentially, that Walker "lacked the diagnostic criteria of a pedophile." See Spencer , ¶ 35. Similar to Dr. Scolatti's testimony in Spencer , Dr. Page would have stated that Walker was not a member of ***19 a group of individuals who fit a specific profile. That information would lead the jury to conclude Walker could not possess the mental state to sexually abuse children. See Spencer , ¶ 38.
¶ 38 In Passmore , Passmore disclosed his intention to call sex-offender evaluator Michael D. Sullivan, MSW, "to testify as an expert witness in the instant case, inasmuch as Mr. Sullivan conducted an evaluation of Mr. Passmore, which revealed that he does not have the characteristics of a sex offender as a result of an extensive assessment." Passmore , ¶ 67. Passmore sought to admit the testimony pursuant to M. R. Evid. 404(a)(1), which allows an accused to offer evidence of a pertinent character trait, and M. R. Evid. 405(a), 702, and 704. Passmore , ¶ 68. Passmore explained he was not offering the testimony for purposes of bolstering his own credibility. Passmore , ¶ 68. The State responded that "sex-offender profile testimony" was generally inadmissible in other jurisdictions and that the evidence was otherwise inadmissible pursuant to Spencer . Passmore , ¶¶ 71-72.
¶ 39 After discussing the extrajurisdictional cases and Spencer , this Court held "that there is neither a per se rule requiring admission, nor a per se rule requiring exclusion, of evidence that a defendant does not possess (or does possess) the character traits of a sex offender." Passmore , ¶ 73. We explained that "admissibility depends on a careful application of M. R. Evid. 403, 404(a)(1), 405(a), and 702." Passmore , ¶ 73. However, we concluded that Passmore failed to provide a record which would allow admission of expert testimony pursuant to M. R. Evid. 702, and we agreed that the district court "was well within its discretion in concluding that on the facts here, any probative value Sullivan's testimony may have had was substantially outweighed by the danger of confusing the issues or misleading the jury." Passmore , ¶ 73 (citing M. R. Evid. 403 ; Spencer , ¶ 41 ).
¶ 40 In Passmore , Sullivan would have testified that Passmore did not have the "characteristics" of a sex offender. Passmore , ¶ 67. Here, Dr. Page would have similarly testified that Walker did not have the characteristics of someone who is sexually attracted to children. Sullivan's and Dr. Page's testimony constitutes the same type of evidence: profile evidence. In Passmore , we held that admissibility of profile evidence depends on a careful application of M. R. Evid. 403, 404(a)(1), 405(a), and 702. Passmore , ¶ 73. Significantly, however, we did not address the effect of admitting profile evidence like we did in Bailey and Spencer . We take this opportunity to explain the inherent problem-recognized in Bailey and Spencer , but not addressed in Passmore - that arises if profile evidence is submitted to the jury:
***20 evidence that a defendant does or does not fit within a class of offenders impermissibly bolsters the defendant's claim of innocence and improperly invades the province of the jury in determining the defendant's guilt or innocence. See Bailey , ¶ 38 ; Spencer , ¶ 41. Apart from the careful application of M. R. Evid. 403, 404(a)(1), 405(a), and 702 required in Passmore , it is still a requirement that the evidence not impermissibly bolster the defendant's claim of innocence or invade the province of the *213 jury to decide guilt or innocence. Here, Dr. Page's clinical finding that, in his professional opinion, Walker did not fit the statistical profile of a pedophile is inadmissible because it related directly to the question of whether Walker was or was not a pedophile capable of committing the crimes for which he was charged.
¶ 41 If profile evidence excluding the defendant from a class of persons known to have certain characteristics is presented to the jury, the jury is essentially asked to conclude that the defendant could not have committed the offense because he does not share certain characteristics with people who are known to have committed that same offense. In this case, Dr. Page would have testified that, based on Walker's psychosexual test results, Walker does not fit into a class of people sexually attracted to children. From this expert testimony opining that Walker's profile is not one of a pedophile flows the inevitable conclusion that, therefore, Walker could not have sexually abused the underage victims. Thus, profile evidence invades the province of the jury in determining the defendant's guilt or innocence and impermissibly bolsters a defendant's claim of innocence. See Spencer , ¶ 41 ; Bailey , ¶ 38. Accordingly, while a "careful application of M. R. Evid. 403, 404(a)(1), 405(a), and 702" is required, Passmore , ¶ 73, the evidence is nonetheless inadmissible if it impermissibly invades the province of the jury. Finally, as in Passmore , where there was no record supporting admission of expert testimony pursuant to M. R. Evid. 702, Walker specifically states he is not seeking admission pursuant to M. R. Evid. 404(a)(1). Accordingly, the careful application of the relevant evidentiary rules required by Passmore cannot be made, even had Dr. Page's profile testimony not invaded the province of the jury.
¶ 42 Importantly, profile evidence like Dr. Page's testimony that Walker does not fit within a class of pedophiles, is, for example, distinguishable from expert testimony on battered woman syndrome. Expert testimony on battered woman syndrome is limited to how women with the syndrome act and behave. State v. Hess , 252 Mont. 205, 210-14, 828 P.2d 382, 386-88 (1992). The expert testifies about consistencies between other abuse victims who have battered woman ***21 syndrome and the behavior of the particular woman. The purpose of the testimony is to explain the woman's behavior that the jury may construe as inconsistent with that of an actual abuse victim. The testimony therefore assists the jury in understanding the woman's actions. Dissimilarly, specific profile evidence, like that Dr. Page would have testified to, relates to psychological tests taken by a defendant as part of the defendant's preparation for trial in the criminal action. Dr. Page's testimony would paint Walker's psychosexual profile as that of someone who is not sexually attracted to children, rather than help the jury understand aspects of Walker's behavior.
¶ 43 Primarily, the distinction rests on whether the testimony is offered to assist the jury with understanding a fact at issue or whether it impermissibly bolsters a defendant's claim of innocence. Dr. Page's testimony concerned test results-which established that, scientifically, Walker does not fit into a class of offenders who are sexually interested in children. The testimony would lead the jury to inevitably conclude that because Walker is not sexually interested in children, he is credible and believable; and that, because Walker is not sexually interested in children, he is not guilty. However, the jury, and not Dr. Page, had the responsibility of determining whether Walker knowingly engaged in sexual contact with the victims. Dr. Page's testimony was based on psychosexual test results opining that Walker is not disposed towards being a member of a class of pedophiles. Being statistically excluded from a class of offenders based on test results is distinguishable from expert testimony offered to help the jury understand a fact at issue. The former instructs the jury that a defendant it not guilty based on testing. The latter may be admissible after a careful application of M. R. Evid. 403, 404(a)(1), 405(a), and 702. Passmore , ¶ 73.
¶ 44 To support his argument on appeal, Walker attempts to draw similarities between the circumstances of his case and those of State v. Mason , 283 Mont. 149, 154-55, 941 P.2d 437, 441 (1997). In Mason , the *214 district court permitted the State to admit testimony from the victim's mental health counselors. At trial, the counselors testified that they observed the victim exhibit certain "behavioral characteristics, such as depression, guilt, and anger, which are symptomatic of sexual abuse victims." Mason , 283 Mont. at 155, 941 P.2d at 441. The district court specifically prohibited the counselors from testifying about the victim's credibility. Mason , 283 Mont. at 155, 941 P.2d at 441. We concluded the district court did not abuse its discretion in admitting the evidence because the counselors' testimony "set forth the counselors' personal observations regarding [the victim's] behavior, ***22 which was relevant to the issue of whether the offenses charged actually occurred. This in turn was relevant to the jury's determination of whether [the defendant] ... committed the offenses charged." Mason , 283 Mont. at 155, 941 P.2d at 441.
¶ 45 Walker's case is readily distinguishable from Mason . In Mason , the counselors testified as to their personal observations of the victim's behavior and observed that, in their experience, those behaviors are symptomatic of sexual abuse. Mason , 283 Mont. at 155, 941 P.2d at 441. Much like the evidence in Hess , the observations were therefore relevant to assist the trier of fact in understanding why the victim would exhibit particular symptoms and to determine whether the offense occurred-a fact in issue. Mason , 283 Mont. at 155, 941 P.2d at 441. An expert may testify in a child sexual offense case regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with sexual abuse or that may establish consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility.
¶ 46 Here, Dr. Page's proposed testimony comes too close to constituting testimony that Walker is not a sex offender, testimony vouching for Walker's veracity, and testimony that Walker is not guilty. In contrast to acceptable testimony pursuant to Mason and Hess , Dr. Page's testimony would not be explaining Walker's behavior, nor would he be testifying regarding consistencies or inconsistencies in behavior between known sex offenders and Walker; rather, the focus of Dr. Page's testimony would be on test results. Dr. Page would have extrapolated data or information from psychological testing conducted on known sexual offenders and compared his extrapolation to Walker's test results. This is different from reliance on actual life events and activities-i.e., patterns of actual behavior. Our decision today does not foreclose an expert from testifying about the behavior and patterns of others in similar circumstances, as substantiated by scientifically collected data, to help explain the defendant's actions to the jury in the case before the trial court. However, that is not what Dr. Page would do here. He would not explain Walker's actions and the actions and patterns of known sex offenders, but would instead compare Walker's psychosexual test results to the results of known sex offenders. We are not prohibiting a comparison of behaviors to assist the jury in determining a fact at issue; we are, however, prohibiting a comparison of test results. See ***23 People v. Dobek , 274 Mich.App. 58, 732 N.W.2d 546, 573-74 (2007).
¶ 47 As a final observation, we must note that other jurisdictions almost universally reject the introduction of expert testimony regarding whether a defendant fits a sexual offender profile. See United States v. St. Pierre , 812 F.2d 417, 420 (8th Cir. 1987) ; State v. Hulbert , 481 N.W.2d 329, 331-33 (Iowa 1992) ; Pendleton v. Commonwealth , 685 S.W.2d 549, 553-54 (Ky. 1985) ; State v. Campbell , 904 S.W.2d 608, 616 (Tenn. Crim. App. 1995) ; Gilstrap v. State , 215 Ga.App. 180, 450 S.E.2d 436, 437 (1994) ; People v. Edwards , 224 Ill.App.3d 1017, 167 Ill.Dec. 54, 586 N.E.2d 1326, 1331 (1992) ; State v. Elbert , 831 S.W.2d 646, 647-48 (Mo. Ct. App. 1992) ; People v. Berrios , 150 Misc.2d 229, 568 N.Y.S.2d 512, 514 (N.Y. Sup. Ct. 1991) ; State v. Armstrong , 587 So.2d 168, 170 (La. Ct. App. 1991) ; State v. Person , 20 Conn.App. 115, 564 A.2d 626, 631-32 (1989) ; State v. Gallup , 98 Or.App. 211, 779 P.2d 169, 171 (1989) ; State v. Fitzgerald , 382 N.W.2d 892, 894-95 (Minn. Ct. App. 1986) ; Williams v. State , 649 S.W.2d 693, 695-96 (Tex. Ct. App. 1983). Courts give various reasons for rejecting *215 of this type of evidence, including that it has not gained general acceptance in the scientific community, it invades the province of the jury, it unfairly prejudices the prosecution, and it does not assist the trier of fact in understanding the evidence or determining a fact in issue.
¶ 48 The District Court did not abuse its discretion when it excluded Dr. Page's testimony. Dr. Page's testimony would have improperly bolstered Walker's claim of innocence and invaded the province of the jury to determine Walker's innocence. While, as we held in Passmore , a court's decision regarding the admissibility of scientific test results offered by an accused pertaining to either his "character" or "characteristics" requires a careful application of M. R. Evid. 403, 404(a)(1), 405(a), and 702, the evidence may not invade the province of the jury, as we held in Spencer and Bailey . Based on Walker's proffer that he sought to admit evidence of testing which would indicate he was not a member of a particular class of individuals sexually attracted to children, we conclude the evidence was inadmissible because it impermissibly bolstered Walker's claim that he was innocent, thus invading the jury's province to determine his guilt or innocence. We accordingly affirm the District Court's exclusion of Dr. Page's testimony.
¶ 49 3. Did the District Court correctly apply Montana's Rape Shield Law, § 45-5-511(2), MCA, to exclude evidence of a victim's alleged prior sexual conduct?
¶ 50 Walker planned to have Wood testify about an incident involving ***24 alleged sexual contact between R.W. and a three-year-old. Wood would have testified about a time when she found the two girls lying in bed together. When Wood noticed the girls, R.W. jumped out of bed and ran away. Wood asked the three-year-old what was going on, and she responded that R.W. was touching her "hoo-hoo," the family term for private parts. She told Wood that R.W. said it would feel good. Wood told Laura and the two of them asked R.W. about the incident. R.W. responded that her older sister, B.W., introduced her to sexual activity. Walker wanted Wood's testimony admitted because he believed R.W.'s past sexual conduct demonstrated her sexual awareness. He reasoned the evidence supported his theory that R.W. acted out in a sexual manner on the morning of February 14, 2015. Walker asserted the information would have aided the jury in evaluating the conflicting testimony before it.
¶ 51 The State requested the District Court exclude Walker's proffered testimony, relying on § 45-5-511(2), MCA, Montana's Rape Shield Law. After hearing argument from each side, the District Court granted the State's motion. On appeal, Walker argues the District Court inappropriately mechanically applied the Rape Shield Law with no regard for Walker's constitutional rights. The State responds, contending the District Court did not mechanically apply the Rape Shield Law because, before excluding the evidence, the court heard argument from each side and considered precedent.
¶ 52 During criminal prosecutions of sexual crimes, Montana's Rape Shield Law generally precludes any "[e]vidence concerning the sexual conduct of the victim." Section 45-5-511(2), MCA.[4] The statute is designed to prevent the defendant's trial "from becoming a trial of the victim's prior sexual conduct" and to protect victims from "harassing or irrelevant questions concerning their past sexual behavior." State v. Colburn , 2016 MT 41, ¶ 22, 382 Mont. 223, 366 P.3d 258 (citing State v. Anderson , 211 Mont. 272, 283, 686 P.2d 193, 199 (1984) ; State v. Higley , 190 Mont. 412, 422, 621 P.2d 1043, 1050-51 (1980) ; Michigan v. Lucas , 500 U.S. 145, 146, 111 S.Ct. 1743, 1745, 114 L.Ed.2d 205 (1991) ).
¶ 53 The Rape Shield Law exists in tension with a defendant's ***25 constitutional rights to confront his accuser and to present evidence in his own defense. Colburn , ¶ 24 (citing U.S. Const. amend. VI ; Mont. Const. art. II, § 24 ; *216 State v. MacKinnon , 1998 MT 78, ¶ 33, 288 Mont. 329, 957 P.2d 23 ; State v. Johnson , 1998 MT 107, ¶ 22, 288 Mont. 513, 958 P.2d 1182 ). However, neither the Rape Shield Law nor the defendant's rights to confront his accuser and present evidence are absolute. State v. Aguado , 2017 MT 54, ¶ 33, 387 Mont. 1, 390 P.3d 628 ; Colburn , ¶ 25 ; MacKinnon , ¶ 33 ; Johnson , ¶¶ 21-23.
¶ 54 Accordingly, a court may not arbitrarily or mechanically apply the Rape Shield Law to exclude evidence; instead, it must strike a balance between the victim's rights under the Rape Shield Law and the defendant's constitutional rights. Colburn , ¶ 25. As it balances those interests, the trial court should "require that the defendant's proffered evidence is not merely speculative or unsupported." Aguado , ¶ 33 (quoting Colburn , ¶ 25, and citing Johnson , ¶ 24 ; State v. Lindberg , 2008 MT 389, ¶ 56, 347 Mont. 76, 196 P.3d 1252 ); see also State v. Awbery , 2016 MT 48, ¶ 20, 382 Mont. 334, 367 P.3d 346. The court should apply M. R. Evid. 401, 402, and 403 in considering whether the evidence is relevant and probative, whether the evidence is merely cumulative of other admissible evidence, and whether the probative value of the evidence is outweighed by its prejudicial effect. Colburn , ¶ 25 ; see also Aguado , ¶ 33. Trial courts balance the interests with the intent to "ensure a fair trial for the defendant while upholding the compelling interest of the Rape Shield Law in preserving the integrity of the trial and keeping it from becoming a trial of the victim." Aguado , ¶ 33 (quoting Colburn , ¶ 25 ).
¶ 55 A district court may not mechanically or arbitrarily apply the Rape Shield Law to unequivocally bar all evidence concerning a victim's past sexual conduct. See Colburn , ¶ 25. For example, in Colburn , an eleven-year-old victim underwent a forensic interview during which she made detailed statements indicating Colburn sexually abused her. Colburn , ¶¶ 10-11. At trial, Colburn sought to introduce evidence that the victim's father was convicted of sexually abusing the victim. Colburn , ¶ 20. Colburn's defense theory was that the victim fabricated her allegations against him and he therefore sought to admit the evidence to demonstrate that the victim's detailed knowledge of sexual abuse stemmed from abuse inflicted by her father, not from abuse inflicted by him. Colburn , ¶ 20. The district court excluded the evidence. Colburn , ¶ 21. We concluded the district court did so in error because it mechanically applied the Rape Shield Law when it failed to balance Colburn's constitutional rights with the ***26 victim's rights under the Rape Shield Law. Colburn , ¶¶ 29-30. Importantly, we noted the evidence-that the victim's father was convicted of sexually assaulting her-was "neither speculative nor unsupported." Colburn , ¶ 25. We remanded the case for a new trial. Colburn , ¶ 30.
¶ 56 We conclude that the District Court did not mechanically apply the Rape Shield Law because it appropriately weighed the parties' competing interests before excluding the evidence of R.W.'s past sexual conduct. When the State requested the District Court exclude the evidence, it argued the alleged incident was neither relevant to nor probative of whether Walker sexually assaulted R.W. on February 14, 2015. The State distinguished Colburn , where the Rape Shield Law did not apply because the victim disclosed sexual abuse by more than one person, and argued the Rape Shield Law should apply in Walker's case because R.W. never disclosed sexual abuse by anyone other than Walker.
¶ 57 The District Court inquired further, asking more about the evidence of R.W.'s sexual conduct at issue. It questioned, "Well, is there any evidence anything even happened?" The State responded that the evidence consisted solely of Wood's hearsay statement of what the three-year-old said to her. The court further asked whether the three-year-old was interviewed about the incident and whether there was any physical evidence, both of which the State answered in the negative. The District Court then gave Walker the opportunity to explain why he thought the evidence should be admitted. Walker explained that he wanted to use the incident to demonstrate R.W.'s knowledge of and exposure to sexual matters. The court followed up with multiple questions, to which Walker responded.
¶ 58 After considering the parties' arguments, the District Court excluded the evidence pursuant to the Rape Shield Law. The *217 District Court told the parties that it would, however, reconsider the issue if presented with different information. Walker thanked the court for its willingness to reconsider the issue but never followed up with further argument. Review of the record demonstrates that the District Court performed a thorough inquiry and appropriately balanced R.W.'s rights under the Rape Shield Law with Walker's constitutional rights. See Colburn , ¶ 25. Because the District Court diligently considered the evidence at issue and weighed the parties' competing interests, we conclude it did not mechanically apply the Rape Shield Law to exclude evidence of R.W.'s sexual conduct.
¶ 59 Further, we note that there was no clear evidence of the prior incident-Walker's proffered evidence of R.W.'s sexual conduct was ***27 speculative and unsupported. See Aguado , ¶ 34 ; Awbery , ¶ 22. He sought to present Wood's hearsay testimony of what the three-year-old told her happened and what the three-year-old said R.W. said. The probative value of Walker's proffered, unsupported evidence would not have been substantially outweighed by its prejudicial effect. See Colburn , ¶ 25 ; M. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...."). District courts have the power and responsibility to manage the defendant's evidence to prevent "sordid probes into a victim's past sexual conduct." Colburn , ¶ 28 (quoting Anderson , 211 Mont. at 284, 686 P.2d at 200 ). The type of evidence Walker sought to admit is precisely the type of probe into R.W.'s past sexual conduct that the Rape Shield Law was designed to exclude, and Walker failed to demonstrate that his constitutional rights outweigh R.W.'s rights under the Rape Shield Law. The District Court correctly applied Montana's Rape Shield Law to exclude evidence regarding R.W.'s sexual conduct.
CONCLUSION
¶ 60 The District Court did not abuse its discretion when it excluded Walker's polygraph evidence or when it excluded evidence pertaining to Walker's psychosexual profile. We further conclude that the District Court correctly balanced Walker's and the victim's competing interests when it applied Montana's Rape Shield Law, § 45-5-511(2), MCA, to exclude evidence of the victim's alleged prior sexual conduct. Walker's conviction is affirmed.
We concur:
MIKE McGRATH, C.J.
BETH BAKER, J.
JIM RICE, J.
Justice Ingrid Gustafson, specially concurring.
¶ 61 Although I agree with the result the Majority has reached, I write separately because its rulings exceed the scope of what is necessary to resolve the issues in this case.
¶ 62 In the proceedings below, Walker filed a discovery notice in which he listed possible defense witnesses, including Dr. Page. The State moved to exclude Dr. Page's testimony because it alleged his testimony would impermissibly bolster Walker's credibility. Walker disagreed, arguing that M. R. Evid. 704 allows an expert witness to enter the province of the jury and testify to an ultimate issue of fact. Walker went on to explain how he believed Dr. Page's opinions constitute clinical findings and not opinions of law, and why these opinions would not impermissibly bolster Walker's testimony. The District Court found Walker's proposed expert testimony indistinguishable from the ***28 testimony found inadmissible in Bailey and granted the State's motion. Based on the evidence Walker offered and the arguments he raised at the time, the District Court ruled within its discretion. Thus, our analysis of the issue on appeal should end here.
¶ 63 On appeal, Walker expands upon the arguments he made to the District Court, offers additional evidence, and raises arguments under Rule 702 for the first time. It is well-established that a party may not raise new arguments or change his legal theory on appeal. State v. Ferguson , 2005 MT 343, ¶ 38, 330 Mont. 103, 126 P.3d 463 (citations omitted). We have long held that it is fundamentally *218 unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider. Comm'r of Political Practices for Mont. v. Wittich , 2017 MT 210, ¶ 72, 388 Mont. 347, 400 P.3d 735 (citation and internal quotation omitted). Thus, I would not consider Walker's Rule 702 argument on appeal, nor would I consider statements he offered during oral argument regarding the substance of the tests Dr. Page performed as part of his psychosexual evaluation.
¶ 64 However, the Majority has gone beyond the bounds of the District Court's proceedings. It has considered Walker's Rule 702 argument and in so doing, it creates new rules of law that broadly curtail trial courts' discretion in making evidentiary rulings on expert testimony. The Majority concluded that a psychosexual evaluation is more like a polygraph examination than like any other type of potentially admissible evidence, and announced a new exclusionary rule prohibiting any scientific evidence that indicates a defendant does not fit the profile of a pedophile. While the Majority looks favorably upon the ruling the District Court made here, and while it finds that ruling consistent with Bailey , Spencer , and Passmore , it has nonetheless determined the trial courts should no longer have the discretion to consider the admissibility of expert testimony regarding psychosexual evaluations under Rules 702 and 704. Instead, it creates a rule that such evidence is per se inadmissible, regardless of the scientific basis of the expert's opinion.
¶ 65 Until now, to determine the admissibility of expert evidence under Rule 702, a district court need determine whether (1) the expert field is reliable and (2) the expert is qualified; the jury then determines whether the expert reliably applied the field to the facts. McClue v. Safeco Ins. Co. , 2015 MT 222, ¶ 22, 380 Mont. 204, 354 P.3d 604 (citation omitted). In this instance, neither party disputed Dr. Page's qualifications. Thus, if we were to conduct an analysis under Rule 702, we need consider only whether the expert field is reliable.
¶ 66 Relying on an undeveloped record, the Majority has concluded the ***29 field is unreliable. The Majority admits, "Walker shared no information with the District Court about the scientific methods by which Dr. Page performed the [psychosexual] evaluation." Opinion, ¶ 27, n.2. The District Court did not have Dr. Page's report, did not know which tests he had performed, and did not know what information Dr. Page had based his results upon at the time it ruled on the State's motion. Walker did not provide information upon which the District Court could have conducted a Rule 702 analysis and determined if the field of psychosexual evaluations was reliable and thus, on review of the record, this Court likewise lacks such information.
¶ 67 Because of the undeveloped record, this case should be distinguished from Spencer . In Spencer , we upheld a district court's decision to exclude from evidence the videotaped testimony of an expert witness who had conducted a psychosexual evaluation of that defendant. In so doing, we reviewed the testimony and questioned whether the testimony, if admitted, would have assisted the trier of fact. We explained:
Though Dr. Scolatti conducted a number of tests ... much of his testimony focused on the Abel Assessment for Sexual Interest test (the Abel test).... Dr. Scolatti stated that the Abel test is controversial among researchers and that he thought the test could be "beaten." He also stated that, when applied to an existing offender group, the Abel test identified child molesters "with different levels of success."
Spencer , ¶ 40. We further commented that Dr. Scolatti had partially based his conclusion Spencer did not have the diagnostic criteria of a pedophile on the fact Spencer told Dr. Scolatti he did not have a sexual interest in children. Spencer , ¶ 41. We found the evidence inadmissible under Rule 403-a theory not at issue in the present case.
¶ 68 The Majority finds the evidence Walker sought to admit via Dr. Page "bear[s] remarkable resemblance to the testimony by Dr. Scolatti that Spencer sought to introduce." Opinion, ¶ 37. Walker, however, offered no evidence of which tests Dr. Page conducted, the focus of his testimony, or whether the tests were controversial or able *219 to be "beaten."[1] Thus, the outcome of Spencer does not control the outcome here. However, Spencer should serve as an example for the kind and ***30 amount of information which a court needs to have in order to rule on admissibility under Rule 702, and consistent with McClue .
¶ 69 Under Walker , courts may no longer weigh the admissibility of such evidence as did the Spencer court. In Passmore , we held there is neither a per se rule requiring admission, nor a per se rule requiring exclusion, of evidence that a defendant does or does not possess the character traits of a sex offender. Rather, admissibility depends on a careful application of Rules 403, 404(a)(1), 405(a), and 702. Passmore , ¶ 73. In this case, the Majority has determined to remove the District Court's discretion to apply the pertinent Rules of Evidence and make such a determination, overruling Passmore and creating a per se rule requiring the exclusion of this evidence. This decision precludes a court from considering if scientific advancements in a field have taken previously specious theories and turned them into reliable, reproducible, and validated results.
¶ 70 A per se rule of exclusion goes against this Court's tendency to allow juries to consider all evidence. In McClue , we reiterated courts should liberally construe the rules of evidence and admit all relevant testimony. We held our standard for admissibility recognizes admissible expert evidence should come in, even if that evidence may be characterized as "shaky." The testimony is then open for attack through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. McClue , ¶ 23 (citations and internal quotations omitted). Under the new standard of admissibility pronounced here, courts will no longer have the discretion to admit certain scientific evidence and subject that evidence to rigorous testing by the State. Instead, defendants and prosecutors will be barred from putting such evidence before the jury in any circumstances, including instances where the results are unquestionably reliable, reproducible, and validated.[2] The Majority holds that parties may present evidence which compares behaviors, but not evidence which compares test results. Opinion, ¶ 46. Blood Alcohol Content (BAC), DNA testing, and ballistics matching are all types of evidence which compare test results. Under this logic, the Majority would find eyewitness testimony that a defendant appeared intoxicated to be more reliable than the results of a blood draw in determining a ***31 DUI accusation. While the field of psychosexual evaluation has not reached-and may never reach-the reliability of BAC testing, it is premature to declare it forever untrustworthy.
¶ 71 Furthermore, in considering Walker's newly-raised arguments concerning Rule 702, the Majority has fundamentally misunderstood his position. When Walker disclosed Dr. Page as a possible witness, he stated Dr. Page would testify, "that upon his psycho-sexual evaluation of Defendant, Defendant has no abnormal or other attraction for pubescent or prepubescent children." The Majority contends that if one accepts Dr. Page's opinion that Walker's psychosexual profile indicates that he is not sexually interested in children, and thus, not a pedophile, that he then "must be innocent of the sexual assaults." Opinion, ¶ 30 (emphasis added). From the evidence we have concerning the expected content of Dr. Page's testimony, it is clear Dr. Page was not expected to testify that Walker did not commit sexual assault and/or incest. Thus, the Court is incorrect when it states that this testimony would "speak directly to the guilt or innocence of the defendant," as being, or not being, sexually interested in children does not prove that Walker is guilty or innocent of sexual assault and incest.
*220 ¶ 72 The applicable statutes elucidate the distinction between being a pedophile-someone sexually attracted to children[3] -and committing sexual assault and/or incest. The crimes of sexual assault and incest both require "sexual contact." Section 45-2-101(67), MCA, defines "sexual contact." It states:
"Sexual contact" means touching of the sexual or other intimate parts of the person of another, directly or through clothing, in order to knowingly or purposely:
(a) cause bodily injury to or humiliate, harass, or degrade another; or
(b) arouse or gratify the sexual response or desire of either party.
¶ 73Under these statutes, in order to commit either sexual assault or incest, the offender must touch the victim with the knowledge or purpose to accomplish one or more of the objectives enumerated in § 45-2-101(67)(a) and (b), MCA. Dr. Page would have offered no opinion on the credibility of Walker's denial, and whether or not Walker committed the offenses with which he was charged. Therefore, a jury could find Dr. Page credible and still conclude Walker had sexual contact with A.W. and/or R.W. for any of the other reasons enumerated in § 45-2-101(67), MCA, and is therefore guilty of the charged offenses ***32 even if he was not motivated by his own sexual gratification.
¶ 74 Although the majority maintains the exclusionary rule it has created is consistent with Bailey , Spencer , and Passmore , I do not see how a blanket prohibition against scientific evidence that indicates a defendant does not fit the profile of a pedophile would not in fact overrule these decisions as well as abrogate our holding in McClue . Rather than allowing courts to apply the Rules of Evidence, this Court has now identified an "inherent problem" in allowing juries to consider profile evidence. It broadly holds that, "evidence that a defendant does or does not fit within a class of offenders impermissibly bolsters the defendant's claim of innocence and improperly invades the province of the jury in determining the defendant's guilt or innocence." Opinion, ¶ 40.
¶ 75 However, we have safeguards to prevent expert testimony from invading the province of the jury. "Expert testimony cannot 'invade the province of the jury' unless the jury is instructed that it must agree with the expert's assessment." State v. Geyman , 224 Mont. 194, 199, 729 P.2d 475, 478 (1986) (citation omitted and emphasis in original) (holding expert testimony concerning the credibility of a child alleged to have been the victim of sexual assault admissible and did not impinge upon jury's obligation to decide credibility). "Our case law demonstrates that even though testimony on an ultimate issue of fact may implicate legal issues, an expert's testimony is admissible as long as it does not reach a legal conclusion or apply the law to the facts." Wittich , ¶ 41 (citation omitted). Our courts routinely instruct jurors they are not bound to believe the testimony of expert witnesses. In cases in which a party offers expert testimony regarding psychosexual evaluations, the court would properly instruct the jury to ensure jurors understand they are free to accept or reject, in whole or in part, the opinions offered by the expert. Montana Criminal Jury Instruction No. 1-113 (2009) states:
A witness who by education and experience has become expert in any art, science, profession or calling may be permitted to state an opinion as to a matter in which the witness is versed and which is material to the case, and may also state the reasons for such opinion. You should consider each expert opinion received in evidence in this case and give it such weight as you think it deserves; and you may reject it entirely if you conclude the reasons given in support of the opinion are unsound.
¶ 76 Finally, the Majority alleges the profile evidence here is distinguishable from another type of profile evidence-expert testimony on battered woman syndrome-because expert testimony on ***33 the latter is limited to "how women with the syndrome act and behave." Opinion, ¶ 42 (citing Hess , generally). In Hess , however, the State did not challenge-and the court did not rule upon-the admissibility of battered woman syndrome, nor was the *221 admissibility challenged on appeal. Rather, although the defendant gave notice of her intent to rely on battered woman syndrome as an affirmative defense, she challenged the State's right to have her examined by their own experts. Hess , 252 Mont. at 209-10, 828 P.2d at 385-86. When this Court has ruled upon the admissibility of expert testimony on battered woman syndrome, it has explicitly declined "to set hard and fast foundational requirements, preferring instead, to leave those to the sound discretion of the trial court...." State v. Stringer , 271 Mont. 367, 378, 897 P.2d 1063, 1070 (1995). This Court has found it within a trial court's discretion to admit evidence of battered woman syndrome where the alleged victim did not recant and the evidence was "indirectly supportive" of her credibility. State v. Bonamarte , 2009 MT 243, ¶ 26, 351 Mont. 419, 213 P.3d 457. It has upheld the trial court's discretion to exclude such evidence where a defendant, accused of deliberate homicide, sought to admit expert testimony that she suffered from battered woman syndrome and post-traumatic stress disorder where the trial court found she had failed to produce an adequate evidentiary foundation. State v. Lotter , 2013 MT 336, 372 Mont. 445, 313 P.3d 148. And it has affirmed the discretion of a trial court to admit expert testimony that domestic violence victims commonly recant. State v. Ankeny , 2010 MT 224, ¶ 49, 358 Mont. 32, 243 P.3d 391.
¶ 77 In Ankeny , the defendant's girlfriend initially informed law enforcement he had choked her. Ankeny , ¶ 7. She later recanted, and at trial denied he had choked her. Ankeny , ¶¶ 8-9. Over Ankeny's objection, the State presented expert testimony from a social worker who opined it was not unusual for domestic violence victims to initially cooperate and later recant. Ankeny , ¶ 14. On appeal, we rejected Ankeny's argument that the expert testimony impermissibly bolstered the victim's credibility, holding it "simply provided the jury with an explanation for the inconsistencies in [her] testimony." Ankeny , ¶ 45. Relying in part on Stringer , 271 Mont. at 377, 897 P.2d at 1069, which held such testimony "merely provided the jury with information to aid the jury in evaluating the evidence," we found no error in the District Court's admission of the expert testimony. However, in spite of McClue and Passmore , and although the arguments for and against admission of profile evidence are analogous, this Court has removed the discretion ***34 of the trial courts here.
¶ 78 I would hold that the admissibility of profile evidence should be left to the sound discretion of the trial court, as it has been until now. For the above reasons, while I would affirm the District Court's rulings, I cannot join in the Majority's Opinion.
Justices Dirk Sandefur and James Jeremiah Shea join in the special concurrence Opinion of Justice Ingrid Gustafson.

Montana is not alone in its complete prohibition of polygraph evidence. See State v. A.O. , 198 N.J. 69, 965 A.2d 152, 161-62 (2009) (citing cases from twenty-eight states barring the admission of polygraph evidence outright).

Our review of the District Court's decision to exclude the psychosexual evaluation is limited to a review of the information the District Court knew about the evaluation when it made its decision. Walker represented that he planned to use Dr. Page as an expert witness, stating, "[Dr. Page] has not yet supplied a written report, but states orally that upon his psycho-sexual evaluation of [Walker], [Walker] has no abnormal or other attraction for pubescent or prepubescent children." Based on that information, the State filed its pretrial motion to exclude Dr. Page's testimony. In response, Walker provided an offer of proof, stating:
Dr. Page has conducted an assessment of Walker and will testify that his findings are as follows: Walker's profile is that he is not sexually interested in school-age males or females, or preschool age males or females. Dr. Page wi[ll] further testify that Walker shows not [sic] no signs of psychopathology or personality pathology. And so Dr. Page, as he will testify, makes no therapeutic recommendations for Walker's case.
Based on the parties' arguments and Walker's proffer, the District Court excluded Dr. Page's testimony. The parties' arguments focused exclusively on the admissibility of Dr. Page's testimony that "Walker's profile" does not fit the class of offenders identified as pedophiles. The parties did not dispute Dr. Page's status as an expert witness and Walker shared no information with the District Court about the scientific methods by which Dr. Page performed the evaluation.

Although we do not rely upon it for our decision, we also observe that the literature discussing the many methods of psychological assessment used to evaluate sex offenders indicates that there is no psychological test or combination of tests that can determine whether a person has engaged or will engage in deviant sexual activity. State v. Parkinson , 128 Idaho 29, 909 P.2d 647, 651 n.1 (Idaho Ct. App. 1996) (citing Myers et al., Expert Testimony in Child Abuse Litigation , 68 Neb. L. Rev. 1, 139, 143-44 (1989) ; William D. Murphy and James M. Peters, Profiling Child Sexual Abusers, Psychological Considerations , 19 CRIMINAL JUSTICE AND BEHAVIOR 24 (1992) ).

There are two narrowly-drawn exceptions to the general rule: parties may present evidence of "the victim's past sexual conduct with the offender" and "evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease that is at issue in the prosecution." Section 45-5-511(2), MCA. Neither exception is at issue here.

The Majority alleges, "Dr. Page would have extrapolated data or information from psychological testing conducted on known sexual offenders and compared his extrapolation to Walker's test results." Opinion, ¶ 46. However, the District Court did not have the benefit of this information when it made its determination.

Moreover, while the Majority prohibits defendants from presenting scientific evidence that indicates they do not fit the profile of a pedophile, the same reasoning will bar prosecutors from presenting scientific evidence that a defendant fits the profile of a pedophile.

Pedophile, Black's Law Dictionary (10th ed. 2014).